**STATE of Tennessee, Petitioner,**

v.

**Dee Washington THOMPSON, Jr., Respondent.**

Supreme Court of Tennessee.

March 3, 1975.

R. A. Ashley, Jr., Atty. Gen., of Tenn., John B. Hagler, Jr., Asst. Atty. Gen., Nashville, for petitioner.

Hubert D. Patty, Eugene B. Dixon, Maryville, for respondent.

## OPINION

BROCK, Justice.

The respondent, Dee Washington Thompson, Jr., was convicted of first degree murder and sentenced to twenty years and one day in the state penitentiary. The Court of Criminal Appeals reversed the conviction and remanded for a new trial because the trial judge failed, *sua sponte*, to instruct the jury the law respecting the rules for weighing circumstantial evidence in a criminal case. The State seeks a review by certiorari and insists the error, if any, was harmless under T.C.A., Sections 27–116, 27–117.

A detailed review of the evidence is necessary. The deceased, Mrs. Irene Roddy, was a thirty-eight-year-old black woman who was living with her father in Alcoa, Tennessee, at the time of her death. Her father testified that between 7:00 and 8:00 p. m. on Saturday, February 17, 1973, he drove her approximately four and one-half blocks from their home to a bingo party given by the Young Women's Circle of the Bethel Baptist Church. Mrs. Roddy was wearing green slacks and a short white coat.

Mrs. Peggy Waldon, an acquaintance of the deceased who lived about a block away from her, was also at the bingo party; and she testified that she left the party with Mrs. Roddy at around 10:10 p. m. Each woman was carrying a bag full of canned soda pop drinks. Mrs. Waldon and Mrs. Roddy commenced walking south in the direction of their homes which were on the same route except that Mrs. Roddy lived about a block beyond Mrs. Waldon. However, as Mrs. Waldon proceeded south on Hall Road, Mrs. Roddy left her to stop at the house of her boy friend, Charles Cox, who lived just off Hall Road about a block from the party. Mrs. Waldon testified that, after leaving the deceased, she was stopped in the next block by a man in a "green type telephone truck." He asked Mrs. Waldon where Third Street was in Alcoa, and she replied that there was no Third Street. The encounter lasted only "three or four seconds" and Mrs. Waldon described the man as "very polite." After her reply he pulled slowly away heading north on Hall Road, and then turned west

on a cross street. As she watched him drive away she saw Mrs. Roddy coming off the porch of Mr. Cox's house alone, approximately a block behind her. She then went "running on home," which was only about a block farther. Mrs. Waldon later identified the man in the truck both from photographs and in the courtroom as the accused, Mr. Thompson.

When Mrs. Waldon arrived home she removed her coat, took her drinks to the kitchen, and then returned to the living room where she was telling her family about the man who stopped her when her story was interrupted by the sound of three shots. Her father-in-law, Mr. Roscoe Lundy, ran out the front door and Mrs. Waldon followed at "about the same instant." She stated that she saw the deceased standing up on the sidewalk diagonally across the street holding her stomach. She did not see any people or any cars or trucks.

Mr. Lundy testified that when he heard the shots he ran to the door, looked out, and saw an old green telephone truck moving very slowly down the street about a half block away. Then he heard a groan and ran across the street to Mrs. Roddy. She was standing bent over holding her side. He testified that he asked her what was wrong and that she replied, "A man shot me." When asked, "What man?" she said, "A white man in that truck." Then she collapsed and a crowd began to gather. She later died in the hospital as a result of the gunshot wounds.

On cross-examination Mr. Lundy admitted that the street on which the murder was committed was lined with large trees but claimed they did not obstruct his view. Further, while he described the dark green truck which was allegedly a half block away he did not know what Mrs. Roddy was wearing (the white coat). Finally, he admitted that the police showed him a photograph of the respondent's truck and he told them he "didn't know whether that was the truck or not."

Mr. Ernest McKessick, a department store employee in Alcoa, testified that he had purchased a new Volkswagen the week prior to the murder and that he spent most of the evening of Saturday, February 17, driving it around Alcoa. He stated that he saw a man driving a dark green panel truck three times that evening—at around 9:45, 10:00, and 10:30 p. m. The first time the truck was parked at approximately the place Mrs. Waldon said she encountered the respondent, and a black woman was beside the truck. The second and third times he passed the truck moving along the street on which the murder was committed. When shown a picture of the respondent's truck at trial he identified it as the truck he had seen. He also identified the respondent as the driver from the photographs, but was unable to identify the black woman. This witness's testimony creates some confusion regarding the time element because Mrs. Waldon allegedly was stopped by the respondent at around 10:20 p. m., immediately prior to the shooting.

The police arrived at the scene of the shooting shortly after 10:30 p. m. and broadcast information about the truck, provided by Mr. Lundy, within 8 to 14 minutes. Shortly thereafter, patrolmen spotted a green panel truck driven by the respondent, Mr. Thompson, over a mile away from the scene of the shooting near the Big K Shopping Center and began following it. The respondent was driving at a normal rate of speed in the direction of his home and made no effort to flee. After several blocks, the police stopped his truck and arrested him. He offered no resistance, and was described by officers as "very calm" and not intoxicated. Police searched the van and discovered a 30 caliber M-1 rifle and a 28 gauge shotgun lying in plain view behind the front seat. They also found five empty 30 caliber shell cas-

ings in the back of the van and three more in the respondent's pocket.

Later that night policemen searched the scene of the murder and found one spent bullet on the sidewalk six inches from the pool of blood marking where Mrs. Roddy fell. A second search six days later turned up two more spent bullets buried three inches underground several feet from the blood spot. Officers estimated the bullets had travelled eight to ten inches in the ground. No shell casings were found at the scene, but the police searched only fifty yards and a 30 caliber M-1 rifle has a considerably longer effective range. This rifle automatically ejects shell casings out the right side when fired.

The remainder of the State's evidence related to ballistics. The rifle, three empty shell casings found in Mr. Thompson's pocket, and two of the three spent bullets found at the scene were sent to the FBI for testing. One of the buried bullets was not sent because it was so badly damaged. According to Sgt. Welch, the other two bullets were in "fair condition." Mr. Perry, a firearms examiner for the FBI, testified that in his opinion the two bullets and three shell casings were fired from Mr. Thompson's rifle to the exclusion of all other weapons. He conceded that being buried underground for six days might damage a bullet but said that this was not the case here; he stated that while one bullet was "considerably mutilated," it still retained "very good marks."

Finally, it should be noted that the State conceded that it was unable to find a motive for the killing.

The respondent did not testify at trial, but Sgt. Welch, who interrogated him on the night of the murder, stated that he said that he had been back in the mountains on the afternoon of February 17 firing the weapons found in the truck. He said that he had returned home and that late in the evening he had gone back out to the Big K Shopping Center to pick up something, at which time he was arrested.

The trial judge charged the jury that the guilt of the accused must be established beyond a reasonable doubt, but he did not instruct them the law respecting the rules for weighing circumstantial evidence in criminal cases, nor did the respondent request such instructions. Was error thus committed?

■ The general principle in criminal cases is that there is a duty upon the trial judge to give a complete charge of the law applicable to the facts of the case and the defendant has a right to have every issue of fact raised by the evidence and material to his defense submitted to the jury upon proper instructions by the judge. Poe v. State, 212 Tenn. 413, 370 S.W.2d 488 (1963).

■■ This Court has consistently held that when *all* the incriminating evidence against the accused in a criminal trial is circumstantial, the failure of the judge to instruct the jury the law of circumstantial evidence, whether or not the respondent requests such instructions, is fundamental reversible error. Bunch v. State, Tenn., 499 S.W.2d 1 (1973); Monts v. State, 214 Tenn. 171, 379 S.W.2d 34; Bishop v. State, 199 Tenn. 428, 287 S.W.2d 49 (1956); Webb v. State, 140 Tenn. 205, 203 S.W. 955 (1918). But, if the evidence against the defendant is both direct and circumstantial, the trial judge must instruct the law for weighing circumstantial evidence, if requested, but, does not commit reversible error by failing to so instruct if not requested to do so. Monts v. State, *supra*.

"Circumstantial evidence differs from direct evidence, and consists of proof of collateral facts and circumstances from which the existence of the main fact may be deduced according to reason and common experience of mankind." Webb v. State, *supra*, 955.

Direct evidence has been defined as evidence which, if believed, proves the existence of the fact in issue without inference

or presumption, whereas circumstantial evidence, without going directly to prove existence of a fact, gives rise to a logical inference that such fact exists. Direct evidence may consist of testimony of a person who has perceived the existence of a fact, sought to be proved or disproved, by means of his senses. People v. Christiansen, 118 Ill.App.2d 51, 254 N.E.2d 156, 158 (1969).

■ Both the State and the defendant appear to have considered that all of the incriminating evidence in this case is circumstantial. Nevertheless, we are of the opinion that some of the material incriminating evidence is direct evidence. For instance, we regard as direct the testimony of the witness, Lundy, that he heard gun shots, ran to his door, looked out, and saw an "old green telephone type" truck moving slowly down the street about one-half block away, that he heard a groan, ran across the street to Mrs. Roddy, who was bent over holding her side, that when he asked what was wrong she replied, "A man shot me," that he asked "What man?" and she replied "A white man in that truck." This, in our opinion, was direct evidence of the *corpus delicti*, a necessary element of the proof in a criminal case. Identity of the accused is only one element necessary to be proved and it may be accomplished by circumstantial evidence. Failure to prove identity by direct evidence does not, in and of itself, create a complete circumstantial evidence case. People v. Christiansen, *supra*.

Therefore, since the evidence is both direct and circumstantial, the trial court did not err in failing, *sua sponte*, to charge the jury respecting the rules for weighing circumstantial evidence. Monts v. State, *supra*. The judgment of the Court of Criminal Appeals is reversed and that of the trial court is affirmed. Costs are adjudged against the defendant.

FONES, C. J., and HARBISON, HENRY and COOPER, JJ., concur.