# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs September 5, 2012

## STATE OF TENNESSEE v. JEREMY STEVENSON

**Appeal from the Criminal Court for Shelby County**
**No. 10-03167      James M. Lammey, Jr., Judge**

---

**No. W2011-02053-CCA-R3-CD  - Filed February 13, 2013**

---

The Defendant-Appellant, Jeremy Stevenson, was convicted by a Shelby County jury of first degree felony murder and especially aggravated robbery and was sentenced to concurrent sentences of life imprisonment and twenty years.  On appeal, Stevenson argues that the evidence is insufficient to establish his identity as the perpetrator of these offenses.  Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which THOMAS T. WOODALL and JEFFREY S. BIVINS, JJ., joined.

Janene N. Oleaga (on appeal and at trial) and Juni S. Ganguli (at trial), Memphis, Tennessee, for the Defendant-Appellant, Jeremy Stevenson.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy E. Wilber, Assistant Attorney General; Amy P. Weirich, District Attorney General; Eric Christensen and Paul Hagerman, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

**Trial.**  Donald Lee, a deputy with the Shelby County Sheriff's Department, testified that on November 19, 2009, at around 7:30 p.m. he received a call that shots had been fired in the Ruthie Cove area.  Because he was near the area at the time, he heard the gunshots. As Deputy Lee drove to the Ruthie Cove area, dispatch told him that a red vehicle had "jumped the curb" and was resting against a fence.

Upon arriving at the location, Deputy Lee observed the red vehicle and smelled "gun powder in the air."  After ensuring that the shooter was no longer in the vicinity, he

approached the vehicle and observed the victim, later identified as Kerry Collins, sitting in the driver's seat. He said the victim had his pants pulled down and was covered in blood. He also saw that the driver's window had shattered and had fallen to the ground. When Deputy Lee discovered that the driver did not have a pulse, he called medical personnel, who pronounced the victim dead at the scene.

Shareka Boyd, Stevenson's co-defendant who was tried separately, testified that she had been incarcerated for the last eighteen months because of this case. She stated that she was seventeen years old at the time of her arrest. Boyd said she had met Stevenson at the Greenbriar Apartments and had known him for approximately two months at the time of the victim's murder. Although she did not know Stevenson well, Boyd said she had spent time with him on several occasions at the apartment complex.

Boyd said that she first met the victim when he flirted with her at a corner store, and they exchanged telephone numbers. The first two times Boyd and the victim met, the victim gave her money. However, the next two times they met, the victim wanted her to do sexual favors for him, and she refused. She said that although she had run away from a Department of Children Services facility, she had not been working as a prostitute. Boyd asserted that she never had sex with the victim. At the time of this incident, Boyd said she had been dating Javarus Ross for approximately seven months.

On November 19, 2009, Boyd and Stevenson were at Veronica Ward's house on Ruthie Cove. Although Ward was Ross's cousin, Ross was not at Ward's house with them that day. However, Ward's three children were present. Boyd said that Ward was pregnant with Stevenson's child at that time. Several times, Ward left the house to go to the store but returned without any items. Boyd saw Stevenson walk to the home across the street to talk to some young men between the ages of eighteen and twenty-three years old who were standing around outside.

Boyd said that at 3:00 or 4:00 p.m. that day the victim called her. At the time of this call, she was at Ward's house, and Stevenson was at the house across the street. The victim told her that he wanted to have sex with her, but she refused. The victim then said that he would bring some money to her.

When Stevenson returned to Ward's house, he told Boyd that "the boys across the street" were talking to him about robbing someone in the Schoolfield neighborhood. Stevenson retrieved a black gun with a clip from the back of the house and told Boyd that he was going to sell the gun to these boys because he needed some money. During this time, Ward was not in the house. Boyd said that Stevenson tucked the gun into his pants and walked across the street while Boyd stayed with Ward's three children.

Boyd said that the victim called her a second time while Stevenson was across the street. The victim asked her where she was, and she told him that she was in Northaven. Stevenson returned to Ward's house while Boyd was talking to the victim. Boyd assumed that Stevenson had returned to the house because the boys across the street had refused to buy the gun. She said that Stevenson walked very slowly past her, and it was obvious that he was trying to listen to her conversation with the victim. Boyd ended her conversation with the victim without making any plans to see him.

Ward returned home. Then Ward left again, claiming that she was going to the store, and Stevenson walked across the street. Stevenson called Boyd over to talk with him and the young men. When she got there, Stevenson asked the young men about the robbery, and they said, "[N]o, Bro, we ain't fixing to [do] no" robbery. She said that the young men repeatedly told Stevenson that they were not going to rob anyone. One of the young men also told Stevenson, "I don't want to buy that broke ass gun, this trigger don't work, man[.]" Then Stevenson left Boyd with the young men and walked back across the street to Ward's house. A few minutes later, Stevenson rejoined her and the young men. Stevenson told the young men that Boyd was his little sister and that "she ain't taking nothing from nobody[.]" Boyd returned to Ward's house.

Boyd said the victim called her a third time, and she walked out of Ward's house to talk to him. Boyd could tell that Stevenson was eavesdropping on her conversation with the victim. The victim told Boyd that he would be there to pick her up around 7:00 p.m., and Boyd told him to call her when he got close. Boyd said that she and the victim did not discuss having sex during this conversation. She said that Stevenson had seen the victim and his car, a red Buick Skylark with dark tinted windows, several times in the past.

Boyd stated that the victim called her a fourth time and told her to meet him on Mike Drive. During the call, the victim gave her directions to Mike Drive from Ruthie Cove, and she walked to this location alone. When she saw the victim, she got into his car, and he drove to an abandoned house on Ruthie Cove. He backed his car into the driveway of the house, and they talked. Boyd said that it was around 7:00 p.m. and that it was dark outside.

Boyd said that the victim pulled his pants down, and someone walked in front of his vehicle. She said she was unable to see who walked in front of the car because she was "trying to see why [the victim] pulled his pants down." She said they had not talked about trading money for sex. The victim told her that they had to go somewhere else because people were walking by the car. At that moment, Boyd looked up and saw someone wearing "a jacket or a pullover" walking away from the car.

As the victim was about to crank his car, a man wearing a ski mask appeared at the driver's side window, pointed a gun inside the car, and shouted, "[P]ut y'all mother f[------] hands up." Boyd said that she immediately knew the person in the ski mask was Stevenson when she heard his voice. She also knew the man was Stevenson because of his body language. She saw a light-colored shirt hanging out from the bottom of Stevenson's pullover. When Stevenson told them to put their hands up, he shot inside the car, and some of the bullets hit the victim. The victim tried to crank his car, but it began to stall and moved slowly out of the driveway. Stevenson continued to shoot into the car. The victim tried to start the car again, which had hit the curb near a stop sign.

Stevenson ran to the car and began shooting inside the car again. At the time, the victim began "hyperventilating[.]" As Stevenson reached into the car, the victim hit him in the mouth. Boyd tried to get out of the car, but Stevenson grabbed her and hit her in the left eye with the barrel of the gun, and she fell on the ground. Stevenson pulled the trigger again, but there were no more bullets in the gun. Boyd noticed that Stevenson was holding a handgun with a long, silver barrel during the incident. Then Stevenson ran off.

Boyd said the victim "bucked his eyes at [her] real hard" before slumping over. She ran to Ward's house but did not call the police. At the time, she was terrified and believed that she was also going to die. Stevenson returned to Ward's house shortly after Boyd got there. He knocked on the door, and Boyd told Ward not to let Stevenson into the house because he had just shot someone. Ward, who did not react to her pleas, opened the door and allowed Stevenson into the house. Boyd began to panic and kept running to the bathroom because she could not control her urine. Stevenson told Boyd, "[I]f you say something, I'm going to kill you."

Boyd said that she was terrified of Stevenson, but she eventually composed herself. Although she stayed at Ward's house that night, she did not sleep. Boyd saw Ward and Stevenson leave the house the next morning. Boyd remained in the house with Ward's children.

Ward returned to the house approximately thirty-five minutes later with Ross. Boyd said that this was the first time she had seen Ross that day. Ross approached Boyd and asked her who hit her in the face. She refused to answer because she was scared of Stevenson. Although Boyd never called the police, police officers arrived at Ward's house the next day while Boyd, Ward, Stevenson, Ross, and Ward's three children were present. Boyd identified a picture of her face showing the injury she sustained when Stevenson hit her on her left eye during the incident. This photograph, which was taken by Ross shortly after the victim's murder, was admitted into evidence.

Boyd said that between the time of the murder and the time the police arrived, Stevenson changed his hair from "dreads" to a "fade" haircut. The police knocked on the front and back doors simultaneously, and Ward opened the back door and allowed the police to enter the home. Boyd said that one of the officers, Sergeant Harris, identified her from a photograph and handcuffed her. Because Sergeant Harris thought Ross was Stevenson, he also handcuffed Ross. The officers searched everyone in the house. When Ross told the officers his name and that he was not Stevenson, the officers told him to be quiet. Stevenson sat on the couch and said nothing.

As the officers took Ross out of the house, Stevenson told Boyd not to say anything. Boyd understood this to mean that if she said anything to the officers, Stevenson would kill her. Then the officers grabbed Stevenson, took him outside, and handcuffed him. The officers confiscated everyone's cell phones. Boyd said officers separated her, Ross, and Stevenson and transported them to jail.

Boyd stated that she wrote a letter to Sergeant Harris the day after she was arrested. In the letter, she claimed that two men approached the car and one of the men shot the victim before both men ran away. She said that she gave this false story regarding the incident so that the attention would be diverted away from Stevenson. Boyd said that she did not tell the truth in the letter because she was afraid that Stevenson would kill her if she "snitched" on him. At the time, she did not know if Stevenson was going to be released.

Boyd said that once she received an attorney, she talked to the police in a face-to-face meeting where she told the officers that Stevenson killed the victim in her presence. She also provided details regarding the incident. Boyd said that she decided to tell the officers the truth because she realized that Stevenson could not harm her. Boyd identified Stevenson's photograph from his arrest at trial. She explained that Stevenson's lip in the photograph was swollen because the victim had hit him during the incident. She also identified the black gun with a clip that Stevenson tried to sell to the young men across the street the day of the victim's murder.

Boyd acknowledged that she had been charged with facilitation of first degree felony murder and facilitation of especially aggravated robbery. She said that she was aware of the sentence ranges that she was facing for these charges. She admitted that she did not want to stay in prison and was interested in minimizing her prison time. Boyd said she did not know that the victim was going to be robbed when she got into his vehicle on November 19, 2009. When asked if she was not guilty of any crime, she stated, "If y'all want to say I'm guilty of prostitution, I'll plead guilty to it. But other than that, I'm not guilty to no murder or no robbery, none of that." She asserted that she was not guilty of facilitation of felony murder

or facilitation of especially aggravated robbery, stating, "I don't got the heart to kill nobody [or] take things from nobody."

Lisa Funte, the medical examiner with the Shelby County Regional Forensic Center, testified that she participated in the victim's autopsy and determined that the victim died from multiple gunshot wounds. Dr. Funte stated that the victim had been shot in the left shoulder, the left thigh, and the right ankle. In addition, the victim had "irregular abrasions" on the left side of his face, his left arm, and the left side of his body and leg, which were consistent with the perpetrator shooting through the victim's closed car window. Dr. Funte said that the bullet for the gunshot wound to the victim's shoulder went through his trachea and his right lung before exiting on the right side of his body and that this wound would have resulted in death without immediate medical intervention. This bullet was recovered. The bullet for the gunshot wound to the victim's thigh fractured his femur and exited the body on the back right side of his left thigh. Finally, the bullet for the gunshot wound to victim's ankle went through the front of the ankle and exited on the side. A bullet fragment was recovered from that wound.

Chris Harris, a sergeant with the Shelby County Sheriff's Office, testified that he was asked to assist in the investigation regarding the victim's death. On November 21, 2009, Sergeant Harris went to 4969 Ruthie Cove in an effort to find Boyd and Stevenson. He and several other officers went to the Ruthie Cove address. He said that after the officers knocked, they heard "movement" inside the house. They continued knocking and Ward eventually opened the door. When Sergeant Harris entered the home, he saw Boyd and two men inside. He said the officers first thought Ross was Stevenson, so they handcuffed Ross. Stevenson did not correct the officers' mistake. When Sergeant Harris heard Stevenson telling Boyd not to say anything, he handcuffed Stevenson as well.

Sergeant Harris said that Ward gave him written consent to search the house. The officers found a box of ammunition for a military rifle in a chest of drawers and a box of ammunition for a .44 Magnum handgun in a closet. Sergeant Harris could not definitively state that the .44 Magnum ammunition was used in the victim's murder. The officers did not find any guns in the house. In addition, the officers were unable to locate the victim's cell phone at Ward's home.

Brad Less, a detective with the Shelby County Sheriff's Department, testified that he responded to the scene at Ruthie Cove just after 8:00 p.m. on November 19, 2009 and collected evidence from the scene. Detective Lee found the back of a cell phone across the street from 4969 Ruthie Cove. In addition, he found a bullet fragment in the street.

Veronica Ward testified that she lived at 4969 Ruthie Cove in November 2009. She said she had known Stevenson for just over two weeks as of November 19, 2009, and during that time, she became pregnant with his child. Ward said that she lied to detectives and the assistant district attorney about the victim's murder. When the assistant district attorney played a recording of a telephone conversation between Ward and Stevenson, Ward told him the truth about what happened.

Ward said that Stevenson called her from jail two days after he was arrested. During this call, Stevenson referred to "dude['s] phone," which Ward understood to mean the victim's phone. When Stevenson asked her if the detectives had found the phone in her trash, Ward told him that they had not found it because she had hidden it in a special place. During the call, Stevenson said that Boyd had "started this."

Ward said she had previously received a letter from Stevenson stating that a cell phone was behind her house. Ward found the phone after the detectives searched her home, and she threw it in the trash can after the detectives had already gone through the trash. Ward could not describe what the cell phone looked like, although she remembered that the back of the phone was missing. Ward said that the cell phone she disposed of could have belonged to Stevenson and did not have the victim's name on it. She admitted that she disposed of the cell phone and lied to the police in order to help Stevenson.

Robert Butterick, a detective with the Shelby County Sheriff's Office, testified that he processed the victim's car. He said that Stevenson's fingerprints were not on the victim's vehicle. In addition, he said that Boyd's fingerprints were not in the victim's car.

Samuel Parnell testified that he lived at 4990 Ruthie Cove and that his friend Allan Garrett lived at 4993 Ruthie Cove in November 2009. On the day of the victim's murder, Parnell was in his backyard with Garrett, Mardricus Dalton, and two other people. Parnell said that he met Stevenson, who had just moved in next door, one day before the victim was murdered.

Parnell said that on November 19, 2009, Stevenson walked up to him and his friends and asked them if they wanted to make some money. When they asked him what he was talking about, Stevenson said, "[W]e fixing to rob this dude." Stevenson told the men that he was going to get the girl next door to promise to "do a sexual favor for the dude" in order to lure him to the area so that he could rob him. Parnell had seen Stevenson with a short woman that day, who kept going back and forth from Parnell's house to her house. He also said that Stevenson talked to him and his friends several times about assisting in the robbery. Parnell declined the offer to help in the robbery, stating that he "was straight." He said that the day of the victim's murder Stevenson was wearing a .38 in the waistband of his pants and

was wearing a long red shirt and blue jeans. However, Parnell said that Stevenson had been carrying a big, chrome handgun the day before the victim's murder. Although Parnell acknowledged testifying at a hearing in January 2010 that Stevenson was wearing a "yellow looking shirt" on November 19, 2009, Parnell asserted that Stevenson changed clothes several times that day and had worn a red shirt, a black shirt, and a yellow shirt during the day the victim was murdered. He admitted that he did not testify about Stevenson changing shirts at the January 2010 hearing.

On the night of the victim's murder, Parnell heard a couple of shots and ran to his little brother's window to see what was happening. He saw a car on the curb, and he went out the back door to investigate. Parnell heard "hollering" from a "strong kind of voice" and then heard "a couple more shots[,]" which forced him back into the house. He was unable to see anyone shooting or running in the area where he heard the shots. When Parnell saw Stevenson the next day, Stevenson did not say anything to him.

Allan Garrett testified that he was sixteen years old when the victim was murdered. He stated that he lived across the street from Parnell in November 2009. Garrett said that he, Parnell, and Dalton were friends. Garrett said that he had met Stevenson one or two weeks before the victim's murder. On November 19, 2009, Garrett said he was hanging out with Parnell, Dalton, and two other guys when Stevenson approached him and asked if he wanted to earn some money. When Garrett asked him how he could make some money, Stevenson said he was going to rob someone. Garrett told him he did not want to be involved. Garrett had noticed that a short woman, Boyd, was with Stevenson that day, and she was on the phone. Stevenson told Garrett that Boyd was going to lure the intended victim of the robbery to Ruthie Cove with the promise of sex. Garrett said Stevenson showed him three different guns that day. The first gun was a chrome .38 special with a black handle, the second gun was a chrome .44 Magnum, and the third gun was a black Uzi. Garrett said that Stevenson was wearing a baggy red shirt on November 19, 2009. Garrett saw Stevenson for the last time around 6:30 p.m. before he went home. Approximately fifteen to twenty minutes after he got home, Garrett heard four or five gunshots. He looked out his window, saw a car on the curb, and told his foster mother to call the police. Garrett acknowledged telling officers on November 22, 2009, that Stevenson was wearing a black shirt; however, he stated that Stevenson had worn a black shirt early in the day and then had changed into a red shirt later in the day.

Mardricus Dalton testified that in November 2009 he was friends with Parnell and Garrett, who lived on Ruthie Cove. On November 19, 2009, Dalton said he was with Parnell and Garrett when Stevenson approached them and asked if they wanted to make some money. When they asked what Stevenson was talking about, he explained that he was going to rob someone and showed them three guns, a .38 special, a gun with a chrome barrel, and

an Uzi. Dalton said he thought Stevenson had showed them the guns in order to get them to help him with the robbery. Stevenson told them that Boyd was going to call the victim to get him to come to the area in order to rob him. At the time, Boyd was across the street talking to someone on her cell phone. Dalton said he heard Boyd ask Stevenson at 5:00 or 6:00 p.m. what they "were going to do because [the victim] was on the way back out there." Dalton told Stevenson that he was not interested in helping him commit a robbery. Despite this, Stevenson returned to talk to Dalton, Parnell, and Garrett several times on November 19, 2009. Dalton said that Stevenson was wearing a red shirt and then changed into a yellow shirt later that day.

At 6:45 p.m. Dalton left Parnell's house to go to his grandmother's house, where his father picked him up. A short time later, Dalton heard on the news that someone had been murdered on Ruthie Cove. Dalton and his mother went to Ruthie Cove, and Dalton saw Stevenson, wearing a yellow shirt, standing at the back of the crowd that had gathered around the crime scene. An officer asked Dalton if he knew what happened but because Dalton had just seen Stevenson in the crowd, he told the officer he did not know anything about the victim's murder. Dalton said that if Stevenson "did something like that and he was standing there watching, ain't no telling what else he'll do."

The day after the murder, Dalton said he was at his grandmother's house with his cousins when Stevenson approached him and stated, "[Y]'all folks scared. Y'all could have made some money, that was some easy money." Dalton talked to Detective Butterick a short time after the murder and told him everything that he had observed the day of the murder.

**ANALYSIS**

Stevenson argues that the evidence is insufficient to support his convictions for first degree felony murder and especially aggravated robbery. Specifically, he claims that the evidence is insufficient to establish his identity as the perpetrator of these offenses because the State failed to present any reliable testimonial evidence or physical evidence connecting him to the offense.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if

-9-

the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and must reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). This court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659. A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

"In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing Duchac v. State, 505 S.W.2d 237, 241 (Tenn. 1973); Marable v. State, 313 S.W.2d 451, 456-58 (Tenn. 1958)). However, "[t]he jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable, 313 S.W.2d at 457). This court may not substitute its inferences for those drawn by the trier of fact in cases involving circumstantial evidence. State v. Sisk, 343 S.W.3d 60, 65 (Tenn. 2011) (citing State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010)). We note that the standard of review "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (quoting State v. Sutton, 166 S.W.3d 686, 689 (Tenn. 2005)); State v. Carruthers, 35 S.W.3d 516, 557 (Tenn. 2000). The court in Dorantes specifically adopted the standard for circumstantial evidence established by the United States Supreme Court in Holland:

> "Circumstantial evidence . . . is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more."

Dorantes, 331 S.W.3d at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)).

"The identity of the perpetrator is an essential element of any crime." State v. Robert Wayne Pryor, No. M2003-02981-CCA-R3-CD, 2005 WL 901140, at *3 (Tenn. Crim. App., at Nashville, Apr. 19, 2005) (citing State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975)). The State has the burden of proving "the identity of the defendant as the perpetrator beyond a reasonable doubt." Id. (citing State v. Sneed, 908 S.W.2d 408, 410 (Tenn. Crim. App. 1995)). The identity of the defendant as the perpetrator may be established by direct evidence, circumstantial evidence, or a combination of the two. Thompson, 519 S.W.2d at 793. "The credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made." State v. Radley, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999) (citing State v. Strickland, 885 S.W.2d 85, 87-88 (Tenn. Crim. App. 1993)). The identification of the defendant as the perpetrator is a question of fact for the jury after considering all the relevant proof. Strickland, 885 S.W.2d at 87 (citing State v. Crawford, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982)).

As relevant here, first degree felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery[.]" T.C.A. § 39-13-202(a)(2) (2006). In addition, especially aggravated robbery is the intentional or knowing theft of property from the person of another accomplished with a deadly weapon and where the victim suffers serious bodily injury. Id. §§ 39-13-401, -403 (2006).

**Accomplice Testimony.** First, Stevenson argues that the trial court erred in not instructing the jury on accomplice testimony because Boyd was an accomplice as a matter of law. He asserts that because the jury was unable to hear the accomplice instruction, it was unable to properly evaluate the testimony of Parnell, Garrett, and Dalton. He also argues that the testimony of Parnell, Garrett, and Dalton did not sufficiently corroborate Boyd's testimony because these witnesses provided varying testimony regarding the clothes he wore and the guns he had in his possession prior to the victim's murder. While acknowledging Ward's testimony about the cell phone, he contends that there was no evidence indicating that this cell phone belonged to the victim. Finally, he asserts that neither Ward's testimony nor the testimony of Parnell, Garrett, and Dalton placed him at the scene of the crime.

The State responds that Boyd was not an accomplice as a matter of law because her testimony showed that she was not involved in the planning of the victim's robbery. It argues that because Boyd was not an accomplice as a matter of law, the issue of whether Boyd was an accomplice was a question of fact for the jury to decide. The State notes that Stevenson failed to request a jury instruction on accomplice testimony or on the requirement of

-11-

corroboration of an accomplice's testimony. Finally, the State argues that even if Boyd was an accomplice, it produced corroborating testimony through Parnell, Garrett, and Dalton. We conclude that Boyd was not an accomplice as a matter of law and that Stevenson has waived this issue by failing to request a jury instruction on accomplice testimony at trial.

It is well-established in Tennessee that "a conviction may not be based solely upon the uncorroborated testimony of an accomplice." State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001) (citing State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994); Monts v. State, 379 S.W.2d 34, 43 (Tenn. 1964)). An accomplice is a person who "knowingly, voluntarily, and with common intent participates with the principal offender in the commission of the crime alleged in the charging instrument." State v. Griffis, 964 S.W.2d 577, 588 (Tenn. Crim. App. 1997) (footnote omitted). To qualify as an accomplice, it is not enough that the witness possess guilty knowledge, be morally delinquent, or even have participated in a separate but related offense. See State v. Lawson, 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990). The test is whether the alleged accomplice could be indicted for the same offense with which the defendant is charged. State v. Green, 915 S.W.2d 827, 831 (Tenn. Crim. App. 1995); Pennington v. State, 478 S.W.2d 892, 897-98 (Tenn. Crim. App. 1971) (citations omitted). This court has previously considered the issue of whether the court or the jury determines a witness's status as an accomplice:

> The question of who determines whether a witness is an accomplice depends upon the evidence introduced during the course of a trial. When the undisputed evidence clearly establishes the witness is an accomplice as a matter of law, the trial court, not the jury, must decide the issue. On the other hand, if the evidence adduced at trial is unclear, conflicts, or is subject to different inferences, the jury, as the trier of fact, is to decide if the witness was an accomplice. If the jury finds the witness was an accomplice, the jury must decide whether the evidence adduced was sufficient to corroborate the witness's testimony.

Griffis, 964 S.W.2d at 588 (footnotes omitted). In other words, if the evidence is clear and undisputed that a witness participated in the crime, then the trial court must declare the witness to be an accomplice as a matter of law and must instruct the jury that this witness's testimony must be corroborated; however, if the evidence is unclear, then the issue of whether a witness is an accomplice is a question of fact for the jury to decide, and if the jury decides that the witness is an accomplice, then it must determine whether there is sufficient evidence corroborating the witness's testimony. Id.; see Lawson, 794 S.W.2d at 369; Bethany v. State, 565 S.W.2d 900, 903 (Tenn. Crim. App. 1978).

We agree with the State that Boyd was not an accomplice as a matter of law. Here, Boyd was charged with facilitation of first degree murder and facilitation of especially aggravated robbery, so she was not indicted for the same offenses as Stevenson. More importantly, Boyd consistently testified at trial that she did not know that Stevenson planned to rob the victim and that she did not lure the victim to the area. She also testified that Stevenson eavesdropped on her conversations with the victim, which would have enabled him to act alone in perpetrating the offenses against the victim in this case. Additionally, Boyd testified that she believed Stevenson was going to kill her during and after the incident. A photograph of Boyd taken shortly after the incident corroborated her claim that Stevenson hit her in the left eye with the gun after shooting the victim. On the other hand, Parnell, Garrett, and Dalton testified that Stevenson told them he was going to get Boyd to lure the victim to the area so that he could rob him. Dalton specifically testified that he heard Boyd ask Stevenson what they "were going to do because [the victim] was on the way back out there." Because the facts regarding Boyd's participation in the crime were not clear and undisputed, we conclude that the issue of whether Boyd was an accomplice was a question of fact for the jury to determine.

We note that the court did not instruct the jury that the issue of whether Boyd was an accomplice was a question of fact to be determined by the jury and that if Boyd was found by the jury to be an accomplice, corroboration of her testimony was required. See T.P.I - Crim. 42.09 (15th ed. 2011). However, the record shows that Stevenson did not specifically request a jury instruction for Boyd on the issue of accomplice testimony. This court has held that when the trial court fails to instruct the jury on the issue of accomplice testimony, it is the defendant's responsibility to request such an instruction, and the defendant's failure to do so results in a waiver of the issue on appeal:

> [O]ur supreme court has held that an instruction on the rule requiring corroboration of an accomplice's testimony is not fundamental. Upon the trial court's failure to instruct the jury regarding accomplice testimony and the requirement of corroboration, it becomes the obligation of the defendant to make a special request for the instruction. In the absence of a special request, the trial court does not err by failing to instruct the jury about accomplice testimony even if the circumstances of the case warrant such an instruction.
>
> . . . .
>
> Upon the trial court's failure to instruct the jury on the issue of accomplice testimony, it became the defendant's responsibility to submit a special request. The failure to do so resulted in a waiver of the issue.

State v. Anderson, 985 S.W.2d 9, 17-18 (Tenn. Crim. App. 1997) (internal citations omitted). Accordingly, Stevenson's claim that the trial court erred by failing to instruct the jury on accomplice testimony is waived. Absent Stevenson's request for this instruction, the trial court had no obligation to instruct the jury on whether Boyd was an accomplice.

We also agree with the State that it presented sufficient corroborating evidence at trial in the event that Boyd was an accomplice. The Tennessee Supreme Court has stated the following regarding the rule of corroboration:

> "[T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence."

Shaw, 37 S.W.3d at 903 (quoting Bigbee, 885 S.W.2d at 803). "[O]nly slight circumstances are required to corroborate an accomplice's testimony." Griffis, 964 S.W.2d at 589 (citations omitted). The jury must determine whether sufficient corroboration exists. Shaw, 37 S.W.3d at 903. As we will explain in the next section, we conclude that the testimony of Ward, Parnell, Garrett, and Dalton fairly and legitimately connected Stevenson to the commission of the charged offenses and sufficiently corroborated Boyd's identification of Stevenson as the perpetrator.

**Absence of Physical Evidence.** Stevenson also argues that "[a]lthough a perpetrator's identity may be established solely on the basis of circumstantial evidence, some physical evidence is implicitly required." First, he claims that his case is distinguishable from State v. Sisk, 343 S.W.3d 60 (Tenn. 2011), and State v. Lewter, 313 S.W.3d 745 (Tenn. 2010), two cases involving purely circumstantial evidence, because there was no physical evidence connecting him to the scene of the crime. He emphasizes that none of his fingerprints were found on the victim's vehicle, that no evidence from the crime scene, including the victim's cell phone, was found in his possession, and that the murder weapon and ammunition for the murder weapon were not found in his possession. He asserts that the absence of any physical evidence connecting him to the offenses "weighs heavily against the sufficiency of the convicting evidence in this case."

-14-

Second, Stevenson argues that his case is similar to Chad Allen Love, a circumstantial evidence case where no physical evidence connected the defendant to the crime scene. State v. Chad Allen Love, No. E2010-01782-CCA-R3-CD, 2012 WL 391064, at *6 (Tenn. Crim. App. Feb. 8, 2012) (noting that there was no physical evidence showing that the defendant had been in or near the restaurant at the time of the robbery). In Chad Allen Love, this court reversed the defendant's conviction after concluding that no rational trier of fact could find that the defendant was the perpetrator of the aggravated robbery beyond a reasonable doubt. Id. at *8. Stevenson asserts that Parnell's, Garrett's, and Dalton's testimony shows only that he was in the area of the crimes prior to the commission of the offenses, and he argues that mere proximity to the scene is not sufficient evidence to sustain his convictions. See id. at *7 (concluding that evidence showing the defendant's proximity to the restaurant seven hours after the robbery was insufficient to support the defendant's conviction for aggravated robbery); State v. Varion Johnson, No. E2010-01363-CCA-R3-CD, 2011 WL 3568275, at *6 (Tenn. Crim. App. Aug. 15, 2011) (stating the fact that the appellant and the perpetrator were in close proximity to one another shortly before the robbery did "not provide the substantial step necessary to support the appellant's conviction for facilitation to commit aggravated robbery"). Stevenson also contends that even if this court credits the evidence showing that he had a relationship with Boyd and that he planned the robbery with her, this evidence is insufficient to sustain his convictions. See Chad Allen Love, 2012 WL 391064, at *7 (concluding that evidence that the defendant was a half-brother of one of the employees of the restaurant that was robbed was insufficient to support the defendant's conviction for aggravated robbery). He claims that there was no reliable evidence showing he participated in the commission of the offenses in this case and that evidence showing that he merely planned a crime is insufficient to support his convictions.

The State responds that despite Stevenson's claims to the contrary, physical evidence is not required to establish a perpetrator's identity. It asserts that Stevenson's reliance on Sisk, Lewter, and Chad Allen Love is "misplaced" because each of these cases "were based solely on circumstantial evidence where no witnesses placed the defendants at the scene of the crimes" and "do not stand for an implicit holding that some physical evidence is required to place the defendant at the scene." The State emphasizes that Boyd provided eyewitness testimony identifying Stevenson as the perpetrator in this case, a fact that Stevenson fails to acknowledge. The State asserts that Boyd's testimony alone is sufficient evidence to support Stevenson's convictions and that even if the jury determined that Boyd was an accomplice, the testimony of Parnell, Garrett, and Dalton sufficiently corroborated her testimony that Stevenson was the perpetrator of these offenses. We agree with the State that physical evidence is not required to establish a perpetrator's identity, that Boyd's testimony was sufficiently corroborated, and that the evidence was sufficient to identify Stevenson as the perpetrator.

-15-

Here, the State presented eyewitness testimony from Boyd identifying Stevenson as the perpetrator of the offenses in this case. Boyd testified that she did not know that Stevenson planned to rob the victim and that she did not lure the victim to the area. Instead, she claimed that Stevenson had been eavesdropping on her conversations with the victim. Boyd overheard Stevenson asking Parnell, Garrett, and Dalton if they wanted to participate in a robbery. A short time later, Boyd got into the car with the victim, who drove them to an abandoned house on Ruthie Cove. She said that a man wearing a ski mask appeared at the victim's window, pointed a gun at the car, and shouted for them to put their hands up. She immediately knew that the man in the ski mask was Stevenson because she recognized his voice and his body language. Boyd witnessed Stevenson kill the victim by firing several shots at him from a handgun with a long, silver barrel. During the altercation, the victim punched Stevenson in the mouth. She identified a photograph of Stevenson from his arrest and noted that Stevenson's lip was swollen because the victim had hit him during the incident. Boyd said that between the time of the victim's murder and the police arriving at Ward's house Stevenson changed his hair from "dreads" to a "fade" haircut.

Boyd's testimony was corroborated by several different witnesses who provided strong circumstantial evidence of Stevenson's identity as the perpetrator. Ward testified that Stevenson called her from jail and referred to "dude['s] phone[,]" which she understood to mean the victim's phone. Ward said that Stevenson had previously written her a letter telling her that a cell phone was behind her house. She located the phone and threw it in her trash can after the detectives had searched her trash. When Stevenson asked Ward if the detectives had found the phone, she told him that they had not found it because she had hidden it in a special place. Ward said that although she could not remember what the phone looked like, she remembered that the back of the cell phone was missing. Detective Less testified that he found the back of a cell phone across the street from Ward's home on Ruthie Cove. Sergeant Harris testified that officers were unable to locate the victim's cell phone at Ward's home. However, he said that he arrested Stevenson after he heard Stevenson telling Boyd not to say anything at the time of her arrest.

Parnell, Garrett, and Dalton also provided strong circumstantial evidence of Stevenson's identity as the perpetrator. They testified that Stevenson had repeatedly asked them to participate in a robbery the day of the victim's murder and had told them that he was going to get Boyd to lure the victim to the area. Parnell said that he saw Stevenson carrying a big, chrome handgun the day before the victim's murder. Garrett and Dalton said Stevenson showed them a chrome .44 Magnum the day the victim was murdered. Garrett saw Stevenson on Ruthie Cove for the last time at 6:30 p.m. and heard four or five gunshots fifteen to twenty minutes later. In addition, Dalton stated that he heard Boyd ask Stevenson about what they were going to do because the victim was coming to the area. Finally, Dalton stated that Stevenson approached him the day after the victim's murder and said, "[Y]'all

-16-

folks scared. Y'all could have made some money, that was some easy money." Viewing the evidence in a light most favorable to the State, we conclude that a rational trier of fact could have found Stevenson to be the perpetrator of the offenses in this case beyond a reasonable doubt. We affirm Stevenson's convictions for first degree felony murder and especially aggravated robbery.

## CONCLUSION

The evidence was sufficient to establish Stevenson's identity as the perpetrator of the first degree felony murder and especially aggravated robbery offenses in this case. The judgments of the trial court are affirmed.

_____
CAMILLE R. McMULLEN, JUDGE