IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs November 1, 2022

## STATE OF TENNESSEE v. KEVIN OWENS

**Appeal from the Criminal Court of Shelby County**
**No. 20-02099     Chris Craft, Judge**

_____

### No. W2022-00353-CCA-R3-CD
_____

The Defendant, Kevin Owens, was convicted by a Shelby County jury of attempted first degree murder, a class A felony, and employing a firearm during the commission of a dangerous felony, a class C felony. *See* Tenn. Code Ann. §§ 39-12-101(a)(2), 39-13-202(a)(1), 39-17-1324(b)(1).  On appeal, the Defendant argues that the evidence is insufficient to support his convictions.  Specifically, he contends that the State's evidence was inadequate to establish his identity as the perpetrator beyond a reasonable doubt.  After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

KYLE A. HIXSON, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and J. ROSS DYER, JJ., joined.

Phyllis L. Aluko, District Public Defender; Harry E. Sayle III (on appeal) and Robert Felkner (at trial), Assistant District Public Defenders, for the appellant, Kevin Owens.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; Jamie Kidd and Abby Wallace, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### I.     FACTUAL AND PROCEDURAL HISTORY

This case arises from an April 30, 2020 shooting at Meadow Glade Lane Apartments in Memphis, Tennessee.  From this incident, a Shelby County grand jury charged the Defendant with attempted first degree murder of the victim, Derionta Brandon, and employing a firearm during the commission of a dangerous felony.

At trial, the victim testified that in early 2020, he hired the Defendant as a Burger King cook. Despite having to discipline the Defendant a few times, he and the Defendant had a good working relationship. Along with giving the Defendant rides home and socializing outside of work with other employees, the two also engaged in a casual sexual relationship, notwithstanding the victim being in a relationship with someone else.

The victim and the Defendant were both working on April 30, 2020, an especially busy day at this Burger King. When the victim rushed the crew, the Defendant appeared offended and gave the victim "a weird look" but never said anything disrespectful. Later in that shift, the Defendant went missing and did not respond to the victim's multiple calls or text messages. Finally, the victim left a message telling the Defendant that he was fired and not to contact him moving forward.

At approximately 8:30 p.m. that evening, after taking a shower and beginning to drink a pint of tequila, the victim heard a knock at his door and saw the Defendant outside dressed in all black. He asked why the Defendant was at his apartment and the Defendant answered that they needed to talk. The victim repeatedly told the Defendant to leave and that the two would talk tomorrow. After about five to six minutes, the Defendant still refused to leave. The victim was fearful but "didn't call the police because . . . [he] didn't think that [the Defendant] would come to shoot [him]." The victim opened the door and let the Defendant inside. The victim noticed something in the Defendant's pocket, and when he asked what it was, the Defendant said it was his cell phone. The victim led the Defendant into his apartment with his back facing the Defendant. The Defendant stood in the kitchen area, near the front door, and the victim stood in the living room. The victim kept his attention on the television and was not looking at the Defendant while the Defendant talked about what happened at work that day. The Defendant seemed "really nice," "like nothing had really happened."

After about two to three minutes, the victim turned back towards the Defendant and saw the Defendant pointing a gun at him. The victim testified that, without saying a word, the Defendant smiled and opened fire. The victim circled around his living room, knocking items and furniture around and shielding his face with his right hand. The victim said the only thing that stopped the Defendant from shooting was his pretending to lose consciousness. That was when the Defendant dropped the gun magazine, grabbed the victim's bag, and ran out of the apartment. The victim started praying, believing he would die. The victim started to feel pain but, still having energy, staggered out of his apartment to get help. Once outside, the victim saw the Defendant beside the victim's car removing items from the victim's bag. The victim returned to his apartment and yelled to the Defendant, "[Y]ou know you're gonna go to jail." The Defendant rushed towards him, so he quickly shut the door, locked it, and pretended to call 9-1-1. The Defendant left.

The victim first called his mother because he thought he was dying, and he wanted her to know it was the Defendant who shot him. The victim then called his boss because

she knew the Defendant and the trouble the victim had with the Defendant at work. The victim stated he wanted to make sure that they knew the Defendant "did it." The victim then called the police and was taken to the hospital. When officers arrived at the hospital, they showed him a six-photograph line-up. The victim could not identify the Defendant but testified that he was on heavy medication and that he did not remember being questioned at that time. The next morning, the victim was shown another six-photograph line-up, and he identified the Defendant as the person who shot him.

The victim testified that he was treated for six injuries: a broken hip, a broken arm, and gunshot wounds to his torso, right hand, arm, and buttocks. He said that he suffered from PTSD, attended therapy, and had trouble holding items in his right hand.

On cross-examination, the victim acknowledged that the Defendant was hired during the COVID-19 pandemic and believed that the Burger King staff wore masks during this time. He stated, however, that he had seen the Defendant "many times" without a mask and identified the Defendant as the person who shot him.

Denise Donaldson, the victim's mother, testified that she received a call from him sometime between 8:35 and 8:40 p.m. on April 30, 2020. She testified that the victim said the Defendant shot him and then hung up the phone. She attempted to call back several times, but the victim did not answer. Mrs. Donaldson said that she then called her husband, told him about the phone call, and the two immediately drove to Memphis.

Memphis Police Department ("MPD") Officer Nigel Payne testified that he arrived on the scene and observed the victim receiving emergency medical care, bleeding, and "screaming in pain." Officer Payne said that he asked the victim who shot him and that the victim identified the Defendant and said that the two worked together at Burger King. This interaction was recorded on Officer Payne's body camera and played for the jury.

MPD Sergeant Vonzell Bibbs of the Felony Response Team testified that he arrived at the scene after the victim was transported to the hospital. In the parking lot of the victim's apartment complex, he observed debris beside the victim's car, "like someone had threw something down from some type of . . . pack." While walking on the breezeway, Sergeant Bibbs noticed blood spatter leading towards the victim's apartment and on the entrance doorway to the apartment. The blood spatter increased as he got closer to the apartment. Once inside, Sergeant Bibbs observed blood on the door and "all over the floor in the living room." It also appeared that furniture had been moved around the room. He observed a gun magazine with live rounds, two shell casings, and a projectile in the front room of the victim's apartment. Sergeant Bibbs testified that officers were not always able to locate every shell casing and projectile at a shooting crime scene. Sergeant Bibbs did not find any cameras or witnesses to the shooting. Photographs taken at the crime scene were entered as exhibits.

MPD Officer Marcus Kirkwood of the Criminal Investigative Services arrived at the scene and assisted in collecting evidence and creating scene diagrams. One diagram pertained to the living room inside the victim's apartment and depicted a "possible blood trail" going around the victim's couch. This diagram also demonstrated the location of the spent shell casings, the gun magazine, and the projectile. Another one of Officer Kirkwood's diagrams showed the breezeway leading to the victim's apartment and depicted the location of possible blood and a cell phone. Another diagram pertained to the parking lot of the apartment complex and marked the location of debris between two cars, which included brass knuckles, cash, an identification card, insurance cards, and other miscellaneous items.

MPD Officer Eric Moore of the Criminal Investigative Services photographed the crime scene and collected and tagged the evidence. He discovered that the gun magazine recovered from the apartment contained 13 rounds. He noted that it was difficult to find all the shell casings at a shooting crime scene because the movement of the shooter affected the pattern of the ejection, and the surface of the floor affected how the casings bounce.

MPD Sergeant Daniel Cordero of the Domestic Violence Bureau testified that he arrived at the hospital on May 1, 2020, the morning after the shooting. The victim was awake and alert but appeared to be in pain. The victim was lucid and able to answer his questions. He testified the victim stated that he and the Defendant had engaged in sexual relations but were not dating. When Sergeant Cordero asked why the Defendant shot him, the victim replied that the Defendant "was mad" because the victim "had fired him the previous evening." The victim did not indicate that the shooting was motivated by their sexual relationship. Sergeant Cordero testified that the Felony Response officers had shown the victim a six-photograph line-up on the previous evening and that the victim was not able to make an identification. Sergeant Cordero noted that the Felony Response report indicated the victim was still in critical care at the time he viewed the first photographic line-up. However, the victim was not in critical care when Sergeant Cordero spoke to him that morning. Sergeant Cordero showed the victim a new six-photograph line-up, and the victim identified the Defendant "immediately." Sergeant Cordero then sought a warrant for the Defendant's arrest. Sergeant Cordero did not request fingerprint analysis from the shell casings or magazine found at the scene.

In June 2020, the Defendant was arrested in Buffalo, New York. He was later extradited to Tennessee for prosecution.

At the conclusion of the trial, the jury convicted the Defendant as charged. At the sentencing hearing, the trial court sentenced the Defendant to 30 years for the attempted first degree murder conviction and eight years for the employing a firearm during the commission of a dangerous felony conviction. The two convictions were run consecutively, resulting in an effective 38-year sentence. The Defendant filed a timely but unsuccessful motion for new trial. This timely appeal followed.

## II. ANALYSIS

The Defendant argues that the evidence is insufficient to prove his identity as the perpetrator of these offenses. The State contends that the evidence is sufficient to support the Defendant's convictions. We agree with the State.

The United States Constitution prohibits the states from depriving "any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1. A state shall not deprive a criminal defendant of his liberty "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). In determining whether a state has met this burden following a finding of guilt, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). Because a guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, the defendant has the burden on appeal of illustrating why the evidence is insufficient to support the jury's verdict. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). If a convicted defendant makes this showing, the finding of guilt shall be set aside. Tenn. R. App. P. 13(e).

"Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). Appellate courts do not "reweigh or reevaluate the evidence." *Id*. (citing *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978)). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Therefore, on appellate review, "the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *Cabbage*, 571 S.W.2d at 835.

The identity of the perpetrator is an essential element of any crime. *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citing *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975)). The State has the burden of proving the identity of the defendant as the perpetrator beyond a reasonable doubt. *State v. Sneed*, 908 S.W.2d 408, 410 (Tenn. Crim. App. 1995) (citing *White v. State*, 533 S.W.2d 735, 744 (Tenn. Crim. App. 1975)). Identity is a question of fact for the jury's determination upon consideration of all competent proof. *State v. Thomas*, 158 S.W.3d 361, 388 (Tenn. 2005). As with any sufficiency analysis, the State is entitled to the strongest legitimate view of the evidence concerning identity contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *See id*. (citing *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992)); *see also State v. Miller*, 638 S.W.3d 136, 158-59 (Tenn. 2021).

Premeditated first degree murder is defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." *Id*. § 39-11-106(a)(21).

> Premeditation is an act done after the exercise of reflection and judgment. Premeditation means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time.

*Id*. § 39-13-202(d) (internal quotations omitted).[1] Criminal attempt, as charged to the jury in this case, occurs when a person acts "with the kind of culpability otherwise required for the offense… [and] [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part." *Id*. § 39-12-101(a)(2).

Under Tennessee law, it is an offense to employ a firearm during the commission of a dangerous felony. Tenn. Code Ann. § 39-17-1324(b)(1). The term "employ" means "to make use of." *State v. Fayne*, 451 S.W.3d 362, 370 (Tenn. 2014) (quotations omitted). Attempted first degree murder is a "dangerous felony." Tenn. Code Ann. § 39-17-1324(i)(1)(A).

The Defendant contends that the State failed to establish his identity as the perpetrator beyond a reasonable doubt. He argues that his convictions rest entirely on the uncorroborated testimony of the victim and the victim's statements to the police. It is the Defendant's contention that the victim had motive to lie to protect an unnamed lover, that there were no other witnesses to the crime, that the victim failed to identify the Defendant in the first photographic line-up, and that the Defendant may not have been in the state at the time of the shooting. The State responds that the evidence sufficiently establishes the Defendant as the perpetrator.

Despite the Defendant's assertion to the contrary, we conclude that the State presented sufficient evidence to establish the Defendant's identity. First, the victim was familiar with the Defendant because the two had worked together for one to two months at Burger King. Even if masks were worn at Burger King, the two socialized outside of work together and had engaged in a sexual relationship. Second, the victim identified the Defendant as the shooter moments after the shooting occurred. Specifically, the victim called his mother and his boss informing them that the Defendant shot him to ensure they knew the perpetrator's identity. The victim's mother corroborated his testimony, saying she received a call that evening from the victim wherein he identified the Defendant as the perpetrator. Third, the victim's identification of the Defendant remained consistent

---

[1] This subsection was redesignated in 2021 and is now located at Tennessee Code Annotated section 39-13-202(e). 2021 Tenn. Pub. Acts, ch. 394, § 1.

throughout the investigation, and he never identified anyone other than the Defendant. While receiving emergency medical care and "screaming in pain" on the ground at his apartment, the victim identified the Defendant as the shooter to Officer Payne and said that he and the Defendant worked together at Burger King. The incident was recorded by Officer Payne's body camera and played for the jury. Though hours after the shooting, while in critical care, the victim was unable to identify the Defendant for MPD Felony Response officers in a photographic line-up, the victim explained he was on heavy medication at this time and that he did not remember speaking to the officers. The next morning, the victim had been removed from critical care, and he "immediately" identified the Defendant for Sergeant Cordero in a second photographic line-up. The jury accredited the victim's repeated identification of the Defendant, as was their province. *Bland*, 958 S.W.2d at 659.

## III. CONCLUSION

Viewing the evidence in the light most favorable to the State, there was ample evidence for a rational trier of fact to conclude that the Defendant committed these offenses. The Defendant is not entitled to relief. In consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
KYLE A. HIXSON, JUDGE