IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
August 14, 2012 Session

**STATE OF TENNESSEE v. SCOTTY DALE STAGGS**

**Appeal from the Criminal Court for Overton County**
**No. 2010-CR-179      Leon C. Burns, Jr., Judge**

**No. M2011-01675-CCA-R3-CD - Filed June 12, 2013**

The Defendant-Appellant, Scotty Dale Staggs, was indicted by an Overton County Grand Jury for aggravated burglary, theft of property valued at more than $500 but less than $1000, theft of property valued at $500 or less, and evading arrest. Prior to trial, the State entered a nolle prosequi on the charge of theft of property valued at $500 or less. Staggs was subsequently convicted of aggravated burglary, a Class C felony; theft of property valued at more than $500 but less than $1000, a Class E felony; and evading arrest, a Class A misdemeanor. The trial court sentenced him as a Range III, persistent offender to concurrent sentences of fifteen years for the aggravated burglary conviction and six years for the theft conviction and sentenced him to a concurrent sentence of eleven months and twenty-nine days for the misdemeanor evading arrest conviction, for an effective sentence of fifteen years in confinement. On appeal, Staggs argues: (1) the evidence is insufficient to sustain his convictions for aggravated burglary, theft of property valued at more than $500 but less than $1000, and evading arrest; (2) the trial court abused its discretion in denying his motion to sever the evading arrest charge from the aggravated burglary and theft charges; (3) the trial court abused its discretion in admitting the victims' surveillance videotape into evidence; (4) the trial court erred in instructing the jury on flight; (5) the State committed prosecutorial misconduct during its opening statement; and (6) his sentence was excessive. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

David N. Brady, District Public Defender; April S. Craven and John B. Nisbet, III, Assistant Public Defenders, Cookeville, Tennessee, for the Defendant-Appellant, Scotty Dale Staggs.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; Randall A. York, District Attorney General; and Mark E. Gore, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

This case concerns the aggravated burglary of a residence in which a .38 Smith and Wesson handgun was stolen. Following the commission of the aggravated burglary and theft offenses, Staggs evaded arrest by law enforcement.

**Pre-trial Motion.** At the pre-trial motion hearing just prior to the start of trial, Staggs's defense attorney informed the court that it had filed a motion in limine, wherein it requested that the State's witnesses be precluded from mentioning that Staggs took any medication from the victim's home, given that the State had agreed to enter a nolle prosequi as to the theft charge regarding the medication. The State said it would announce the fact that it was entering a nolle prosequi as to that count but asserted that it would be introducing a surveillance videotape showing Staggs picking up what it believed to be a medication packet in the victims' kitchen. The State asserted that "under 404(b), [the victims, Sheila and Darroll Carr] can testify that . . . it's their opinion that [Staggs] got that medication at that point." The State added that the Carrs reviewed the video and that Sheila Carr was the caretaker of Imogene Staggs, whose medication was stolen. However, the State said that it agreed to enter a nolle prosequi as to the theft count regarding the medication because Imogene Staggs was elderly and unable to testify at trial. The State asserted that "under 404(b)[,] we'd still be able to discuss the fact [that Sheila and Darroll Carr believed that Staggs took] the medication that day." At that point, the following exchange occurred:

The Court: How is that relevant to burglary or theft of the gun?

[The State]: Well, Judge, it's relevant to burglary in that he's in their home without consent and stealing their property. He didn't have consent to get the medication. He didn't have consent to get the gun.

The Court: Well, [defense counsel]?

. . . .

[Defense Counsel]: Well, Your Honor, first of all I would say that it's not relevant to aggravated burglary or to the theft over five hundred ($500). I would also say, under [Rule] 403, it's

-2-

overly prejudicial. Another reason, the owner of the medication is not present to testify today. Based on that, Your Honor, we'd ask that the [State] be instructed to redact the portion of the tape where it shows him picking up the medicine. If Your Honor can't see fit to make that ruling, we'd ask in the alternative that the jurors see [the surveillance videotape], and whatever the jurors see, they can think whatever they want to think, but the witnesses not comment on it.

The Court: Well, I don't think the matter would be relevant to the burglary or the theft of the other items, so I would grant the motion [in limine requesting that the State's witnesses be precluded from mentioning that Staggs took the medication from the victim's home]. I don't think the video should be redacted, but I would agree with the defense that the witnesses should not talk about the theft of the medicine. We'll let the video speak for itself without comment.

[The State]: Yes, Your Honor. I'll instruct the witnesses.

Next, defense counsel informed the trial court that she had filed a motion to sever the evading arrest count from the indictment because it was not part of a common scheme or plan. She said the proof would show that although the alleged victims told Staggs to stop, they were not law enforcement officers. Moreover, she said that approximately two hours passed before the officers located Staggs. The State responded that the evading arrest offense was part of "one single criminal episode" because when Staggs was confronted by Carl Carr at the victim's house at the time of the aggravated burglary, Staggs fled and went to a location some distance away from the scene. The State asserted that Staggs was then confronted by Darroll Carr and later confronted by Darroll and Sheila Carr, who chased him over a long distance. Shortly thereafter, Detective Mike Phillips from the sheriff's department arrived, located Staggs, and ordered Staggs to stop as Staggs was about to get into a car with someone. The State said Staggs saw Detective Phillips and fled on foot, and Detective Phillips eventually stopped him and took him into custody. Following counsel's arguments, the trial court determined that "under the circumstances, . . . this is proper to be tried together, and I'd deny your motion for a severance."

Defense counsel also argued for the suppression of the surveillance videotape because "there was no one there operating the camera to authenticate that [the videotape] actually

-3-

depict[ed] what the scene was at the time." She also argued that there was a possibility that the victims altered the date and time stamp on the videotape to show the date that Staggs was arrested. She added, "[C]hanging a date on some kind of digital equipment, probably for people who know what they're doing, would not be a hard thing to do at all."

The State responded that if the defense wanted to argue to the jury that the date and time stamp had been changed, it could do that. It then argued that the surveillance videotape was properly authenticated under Rule 901 of the Tennessee Rules of Evidence. At that point, the trial court stated, "Well, I'm going to deny the motion. I don't think it's necessary for us to go into a discussion if it's . . . a surveillance camera that was set up, and it was not necessary that there be someone there with it watching the surveillance camera for it to be admitted." The court also denied the defense's request that the date and time stamp be redacted from the videotape. The court added that the Darroll and Sheila Carr "would be subject to cross-examination about the possibility of [the date and time stamp] being changed[.]"

**Trial.** Darroll Carr testified that on April 10, 2010, a .38 Smith and Wesson handgun was stolen from his home at 877 Old Celina Highway, Celina, Tennessee. Mr. Carr stated that he lived at this home with his wife, Sheila Carr, and his stepson and that his wife's mother, Imogene Staggs, lived across the street. Mr. Carr stated that he knew Scotty Dale Staggs, the Defendant-Appellant, because he was his wife's nephew. He stated that Staggs lived with Staggs's grandmother, Imogene Staggs, in April of 2010.

Mr. Carr stated that around 8:00 a.m. on April 10, 2010, Staggs called him to ask if he and his ex-wife could borrow his four-wheeler to go mushroom hunting. Mr. Carr told him that he and his two sisters were going to use the four-wheeler to do some hunting but that Staggs was welcome to join them. At around 9:00 a.m., Mr. Carr and his sisters left on the four-wheeler to go hunting, and Mr. Carr left his eighty-nine-year-old father, who was visiting him and was in good health, at his house. Mr. Carr explained that he owned a .38 Smith and Wesson handgun for protection that he had bought from his wife's brother approximately five years ago. He said that since this incident, he had looked for an identical gun but only found other, less-expensive guns, which sold for over $700. Before Mr. Carr went hunting, he picked up the handgun and considered taking it to the woods but decided to leave it at home. He put the gun back in its box beside his bed before he left. Mr. Carr stated that he and his sisters went mushroom hunting for approximately two hours before returning to his home around 11:00 a.m.

Mr. Carr said that as soon as he returned home, his father Carl Carr told him that Staggs had been in Mr. Carr's bedroom. Mr. Carr immediately thought of his handgun and wished that he had taken it with him. He said Staggs did not have permission to be in his

-4-

home and did not have permission to exercise control or possession of any of his property, including his .38 Smith and Wesson handgun. Once Mr. Carr realized that the handgun was missing, he and his two sisters got into his truck and drove to Staggs's ex-wife's house on Firehill Road. When they arrived at this house, Mr. Carr saw Stagg's ex-mother-in-law and ex-father-in-law, who told them that Staggs and his ex-wife were inside the house. When Mr. Carr yelled for Staggs to bring him his gun, Staggs exited the house and said, "I ain't been in your house[,] and I ain't got your gun." Mr. Carr cursed at him and then got back into his truck with his sisters and returned home.

Upon arriving home, Mr. Carr met his wife and told her what had happened. A short time later, Staggs and his ex-wife arrived. Mr. Carr said Staggs's ex-wife told him to check her car because she did not have his handgun. Mr. Carr checked her vehicle and confirmed that the gun was not there. Staggs's ex-wife left, and Staggs returned to his grandmother's house.

At that point, Mr. Carr said that his wife walked across the street to talk to Staggs. He followed her next door and saw Staggs "come out from behind" his grandmother's house from an area that did not have a door, which led Mr. Carr to believe that Staggs exited the house through his bedroom window because there was "no other way he could get out." When Mr. Carr and his wife saw Staggs walking toward the field, Mrs. Carr ran after him. Staggs raised his shirt and told her, "I ain't got your gun. Look here, Aunt Sheila, I ain't got it." Mr. Carr saw that Staggs had a red bag on his wrist at the time, and Mr. Carr believed that this bag contained his handgun. Staggs refused to open the bag and "took off running" when he and his wife got close to him. At that moment, his sister drove up on his four-wheeler. Mr. Carr got on the four-wheeler and followed Staggs and his wife. When he got close to Staggs, Staggs ducked under a barbed wire fence and "kept running." Mr. Carr and his wife returned to the house. A few minutes later, they drove up the road on the four-wheeler and saw Staggs lying on the ground attempting to hide. Mr. Carr again told Staggs he wanted his gun, and Staggs replied, "I ain't got your gun." Mr. Carr told Staggs that he knew he had his gun and that if he would give him the gun, "everything [would] be all right." Staggs continued to deny that he had the handgun. When Mr. Carr told Staggs that he could tell the police that he did not have the gun, Staggs "took off running" down the hill. Mr. Carr said that he did not chase after him and that he did not see Staggs again until officers from the sheriff's department took him into custody approximately a quarter of a mile from where Staggs had been lying on the ground.

Mr. Carr said that he and his wife looked for his gun at their home, but they never found it. He knew his gun had been stolen because it was not in its box. He said his wife called the sheriff's department, and he later discussed the incident with an officer. Mr. Carr

said he showed the officers the route Staggs took when he ran from them. He said he never recovered his gun.

Mr. Carr stated that he had a surveillance camera that was operating the day the offenses in this case occurred. He said the camera, which is in a small black box on top of his microwave, points directly at the front door of his home. In addition to the camera, Mr. Carr said he had alarms on each door that sounded when the doors were opened. However, the alarms on these doors were not set up to notify the police department.

On cross-examination, Mr. Carr acknowledged that he did not personally see Staggs take his gun on April 10, 2010. He also acknowledged that his home was not locked the day the gun was taken. Mr. Carr admitted that he did not have a photograph of his gun and did not have a receipt from the purchase of the gun. However, he asserted that his gun was worth more than $500. Mr. Carr stated that Staggs "held on to this [red] bag with his life" during the chase. He said the only time Staggs was allowed in his home was when he and his wife were present. Mr. Carr admitted that Staggs knew of some of the guns he kept at his house.

Sheila Carr, Darroll Carr's wife, testified that on April 10, 2010, her husband called her to inform her that their handgun had been stolen. She immediately asked her husband if he had called the police. When she returned home around 11:00 a.m., she called the sheriff's department to inform them that her nephew had stolen their gun and that her husband had chased after him. Mrs. Carr said that while she was waiting on the officer to arrive, Staggs's ex-wife brought Staggs back to Imogene Staggs's house. Mrs. Carr said she walked over to her mother's house, where Staggs was on the porch. When she confronted Staggs about stealing the gun, Staggs said, "I haven't got anything. I haven't been in your house." At that point, Mrs. Carr said that her husband told her to come back home. As she turned to leave her mother's home, Staggs ran away. When she and her husband ran after him, Staggs pulled up his shirt and told her he did not have their gun. She continued to chase Staggs on foot, and her husband chased him on the four-wheeler until Staggs went under the barbed wire fence and disappeared.

Mrs. Carr said she saw Staggs standing in a neighbor's yard after she returned from picking up her son. She stopped her car and told her son to run home, call the police, and tell his father where she was. Mrs. Carr parked her truck and began running after Staggs. She also called 9-1-1 and told them of her location. She continued to chase Staggs until she saw him near a truck that had stopped in the road, and she told the driver of the truck not to give Staggs a ride. Mrs. Carr said she lost Staggs when he ran into Hunter's Cove. She later saw Staggs on Palestine Highway after the officers had handcuffed him.

Mrs. Carr said Staggs did not have permission to be in her home. She said she had a surveillance camera and an alarm system in her home as well as alarms on all of her doors. She stated that she purchased the surveillance camera at "the Spy Store [in] Cookeville" and that the camera had never malfunctioned. Following the incident in this case, she reviewed the surveillance videotape and took the videotape to Michael's Video in Cookeville, where the videotape was copied onto a DVD for trial. She stated that she reviewed the DVD and that it captured the events that occurred in her home on April 10, 2010. The DVD was played for the jury.

On cross-examination, Mrs. Carr stated that the video surveillance equipment had been in her home for the last three years. She acknowledged that Staggs had been invited into her home in the past while she and her husband were present. She also acknowledged that she did not see Staggs take their gun out of her home and did not see him throw anything away while she and her husband were chasing him. Mrs. Carr admitted that the door to her home was not locked on April 10, 2010. She said that when she purchased the camera, the store set the date and time stamp for her and that she did not know how to set the date and time mechanism herself.

Carl Carr, Darroll Carr's eighty-nine-year-old father, testified that on April 10, 2010, Staggs was supposed to go mushroom hunting with his son, but Staggs "got out of it[.]" He said that after his son left, he was alone at his son's house. When he stepped out into the yard, Staggs "hollered" at him to come next door. When he walked over, Staggs asked him if anyone was at Mr. Carrs's home. As they entered Imogene Staggs's home, they saw Imogene Staggs and Staggs's ex-wife. Carl Carr thought that Staggs would stay and visit with them in the front room, but Staggs went through the kitchen and did not return. He asked Staggs's ex-wife where Staggs went, and shortly thereafter, he saw Staggs walk past the window outside and look in the window to see where he was sitting. At that point, Carl Carr became suspicious of Staggs's behavior, and he told the ladies that he needed to return to his son's house because he was expecting a phone call. When he entered his son's house, he made a lot of noise to alert Staggs that he was there. Carl Carr knew Staggs was already inside his son's home because he had not seen Staggs outside. He could hear Staggs opening drawers and cabinets and "making a pretty good racket." Because Carl Carr remembered his son telling him that he had a loaded gun in his bedroom, he decided not to confront Staggs in the bedroom and waited until Staggs left the bedroom. A moment later, Staggs exited the home through the side door, setting off the door alarm, and Carl left the house through the front door. Carl Carr said that as he walked outside, he saw Staggs run around the corner of his son's house with "something white in his right hand."

On cross-examination, Carl Carr admitted that Staggs visited his son and daughter-in-law "a whole lot." He said that although he did not see Staggs enter his son's bedroom, he

saw Staggs exit the bedroom. He admitted that he did not see Staggs holding a gun as he ran from his son's house; however, he asserted that Staggs was holding a white bag as he ran away. Carl Carr said that despite his hearing problems and the fact that Staggs had the bedroom door closed, he could hear Staggs opening and shutting drawers and cabinets in his son's bedroom.

Mike Phillips, a detective with the Overton County Sheriff's Department at the time of the offense, testified that on April 10, 2010, he responded to a burglary of a handgun at the Carrs' residence. When he and Sergeant Jeremy Carr arrived at the home, he spoke to Darroll Carr, who identified Staggs as the perpetrator. Detective Phillips said that Mr. Carr took him to the location where they had last seen Staggs, and they found fresh footprints and followed them. After searching for an hour and losing Staggs's trail at one point, Detective Phillips said he eventually found Staggs approximately three-fourths of a mile down the road. Detective Phillips said that when he first saw Staggs, he was in his patrol car and Staggs was attempting to get into a vehicle. Detective Phillips jumped out of his patrol car, while in uniform, and ordered Staggs and the driver of the vehicle to stop. When he told Staggs to stop a second time, Staggs took off running. Detective Phillips chased Staggs and commanded him to stop several more times, but Staggs kept running. Finally, Detective Phillips apprehended Staggs after chasing him through a barbed wire fence. He grabbed Staggs and put him on the ground because he knew that Staggs likely had a loaded weapon in his possession.

On cross-examination, Detective Phillips admitted that he had no proof that a gun existed other than what Mr. and Mrs. Carr had told him. He also admitted that he never saw Staggs with a gun during the chase and never recovered a gun from him when he took him into custody. Detective Phillips said he asked Staggs where the gun was at the time he was handcuffing him, and Staggs said, "I don't know what you are talking about." He acknowledged that the Carrs never showed him a receipt or a photograph of the gun that was taken. Following the close of proof, the jury convicted Staggs of aggravated burglary, theft of property valued at more than $500 but less than $1000, and evading arrest.

**Sentencing Hearing.** Barbara Allen, a probation officer with the Tennessee Board of Probation and Parole, testified that she prepared Staggs's presentence investigation report. She stated that Staggs had a lengthy history of criminal convictions and that Staggs had violated the terms of his probation eight times. The State admitted certified copies of convictions for aggravated burglary, theft of property valued at $1000 or more but less than $10,000, two burglaries, theft of property valued at more than $500 but less than $1000, felony evading arrest, and misdemeanor theft of property valued at $500 or less. Allen stated that Staggs provided employment information for only two jobs, which she had been unable

to verify. In addition, she said Staggs tested positive for marijuana and admitted that he smoked marijuana inside the jail.

Sheila Carr testified that Staggs was her nephew and that he had been convicted of burglarizing her home and stealing a handgun. She said she had been unable to trust anyone since these crimes occurred. Mrs. Carr said she had helped raise Staggs but had been unable to trust him for a long time. After she and her husband had things that had suddenly gone missing, they learned not to have Staggs around when they were not at home. She confirmed that Staggs did not have permission to go into her house on April 10, 2010. She said that Staggs had been drug rehabilitation five times with his family's support but had been unable to conquer his addiction to drugs. She said she hoped the trial court would impose a sentence of confinement so that Staggs would think about the things he had done.

Darroll Carr testified that he and his wife were afraid to leave the house after this incident occurred. He said he never recovered the gun that was stolen. He asked the trial court to sentence Staggs to fifteen years in confinement for these offenses.

Staggs made the following statement of allocution:

Your Honor, first I want to apologize to you and the court and my family for what I did. I'm sober now, and I know what I did was wrong. I am sorry I have done this to my family and put them through this. I could never physically hurt them or anybody else for that matter.

I really didn't want to take–to waste everyone's time and the [S]tate's money on a trial. The [S]tate first offered me two [sentences of eleven months and twenty-nine days] to serve[,] and I agreed to take it. Then they took it off the table[,] and the [S]tate said they would consider a six-year sentence at Range II and me pay restitution. I agreed to take it. The [S]tate then took it off the table. I practically begged to plead out. I knew it was a waste of time and the [S]tate's money, but the [State] insisted on trial.

I would like to now ask the Court to consider some leniency in my sentence. Thank you, sir.

The court noted that Staggs had "numerous violations of probation." It also said, "[T]he distressing thing here is that there have been numerous thefts in your history and numerous forgeries and worthless checks, and they date back to 2001, 2002 and forward."

After hearing arguments from counsel, the trial court told Staggs that he was struggling to find any redeeming qualities in him, given that he had a lengthy criminal history, was addicted to drugs, and had never made any serious attempts to end his addition. The court noted that Staggs had never "accept[ed] responsibility" for his actions and had never acted "somewhat remorseful[.]" The court emphasized Staggs's lack of remorse regarding committing these offenses against his family:

> And in regards to lack of remorse it seems particularly distressing to the Court to think of here, family, right across the road from where you lived, took advantage of the opportunity to run into their house, caught on camera. I suppose the camera was there because they knew you were across the road, I guess, but so little regard for their rights and property that–well, it's easy. Rather than go break in somebody else's house, just go in their house, the people who helped raise you.

The trial court applied the enhancement factors that Staggs had "a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range" and that he had "before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community[.]" T.C.A. § 40-35-114(1), (8) (2006). Although the court applied the mitigating factor that Staggs "neither caused nor threatened serious bodily injury[,]" it did not give this factor "a whole lot of weight[.]"

Regarding Staggs's sentencing range, the court found that although six certified copies of felony convictions had been introduced, these six convictions were reduced to five convictions, ranging from a C to an E felony, given that there was "no proof that two of these did not occur within a 24-hour period." Consequently, the court determined that Staggs was a Class III, persistent offender, with a release eligibility of forty-five percent for the aggravated burglary and theft convictions. See id. §§ 40-35-107(a)(1), (b)(4) (2006).

The trial court also determined that Staggs was not a good candidate for rehabilitation because of his lengthy history of criminal convictions and criminal behavior. However, it imposed concurrent sentencing because "these offenses all occurred at one time." The court also imposed a sentence of confinement, stating:

> I just think that burglaries and thefts are so connected to the drug scene that we just have to make some statement here to indicate the seriousness of the offense and try to at least give some impression of deterrence to others. A 15-year sentence at 45 percent for the aggravated burglary, a six-year sentence for the theft, and an 11[-month and] 29[-day] sentence for the [misdemeanor]

-10-

evading arrest [conviction]; so as a Range III and then a 15-year effective sentence, all concurrent.

Staggs filed a timely motion for new trial and an amended motion for new trial, which were denied. He then filed a timely notice of appeal.

**ANALYSIS**

**I. Sufficiency of the Evidence.** Staggs asserts that the evidence is insufficient to sustain his convictions for aggravated burglary, evading arrest, and theft of property valued at more than $500 but less than $1000. Specifically, he argues the State failed to prove beyond a reasonable doubt that he entered the victims' house with an intent to commit a theft, that he stole a handgun, or that he knew a law enforcement officer was attempting to arrest him. Staggs also argues that no evidence, other than the victim's testimony, indicated the existence of a handgun in the victims' home that could have been stolen. To buttress this claim, he notes that the handgun was never recovered and that the victims failed to produce a receipt for the gun and failed to offer a photograph of the gun at trial. In addition, Staggs states that he has consistently denied that he was in the victims' home and that he took anything from the house. In response, the State contends that the proof at trial established that Staggs entered the victims' home without their effective consent and stole their .38 Smith and Wesson handgun, which was worth more than $500, before fleeing from a law enforcement officer. We conclude that the evidence is sufficient to sustain his convictions.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)).

The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). When reviewing issues regarding the sufficiency of the

evidence, this court shall not "reweigh or reevaluate the evidence." Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). This court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659. A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

"The identity of the perpetrator is an essential element of any crime." State v. Robert Wayne Pryor, No. M2003-02981-CCA-R3-CD, 2005 WL 901140, at *3 (Tenn. Crim. App., at Nashville, Apr. 19, 2005) (citing State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975)). The State has the burden of proving "the identity of the defendant as the perpetrator beyond a reasonable doubt." Id. (citing State v. Sneed, 908 S.W.2d 408, 410 (Tenn. Crim. App. 1995)). The identity of the defendant as the perpetrator may be established by direct evidence, circumstantial evidence, or a combination of the two. Thompson, 519 S.W.2d at 793. "The credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made." State v. Radley, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999) (citing State v. Strickland, 885 S.W.2d 85, 87-88 (Tenn. Crim. App. 1993)). The identification of the defendant as the perpetrator is a question of fact for the jury after considering all the relevant proof. Strickland, 885 S.W.2d at 87 (citing State v. Crawford, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982)).

Staggs argues that the evidence is insufficient to sustain his convictions for aggravated burglary, evading arrest, and theft of property valued at more than $500 but less than $1000. Aggravated burglary is defined as a "burglary of a habitation as defined in §§ 39-14-401 and 3-14-402." T.C.A. § 39-14-403(a) (2010). A "habitation" is "any structure, including buildings, . . . which is designed or adapted for the overnight accommodation of persons[.]" Id. § 39-14-401(1)(A) (2010). As relevant in this case, "A person commits burglary who, without the effective consent of the property owner . . . [e]nters a building and commits . . . a felony, theft or assault[.]" Id. § 39-14-402(a)(3) (2010).

In addition, "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Id. § 39-14-103(a) (2010). Theft of property valued at more than $500 but less than $1000 is a Class E felony. Id. § 39-14-105(a)(2) (2010). Finally, misdemeanor evading arrest is committed when a person "intentionally flee[s] by any means of locomotion from anyone the person knows to be a law enforcement officer if the person . . . [k]nows the officer is attempting to arrest the person . . . or . . . [h]as been arrested." Id. § 39-16-603(a)(1) (2010).

The proof at trial established that Staggs, without his aunt's and uncles's effective consent, entered their home and committed the felony of theft of a property valued at more than $500 but less than $1000. Specifically, Staggs obtained the victims' .38 Smith and Wesson handgun, worth more than $500, without his aunt's and uncle's effective consent. Carl Carr testified that Staggs lured him out of his son's home in order to commit the aggravated burglary and theft. When he entered his son's house, he heard Staggs in his son's bedroom opening and shutting drawers and cabinets. When Staggs exited to the side door of the house, Carl Carr left through the front door and saw Staggs run around the corner of his son's house with "something white in his right hand."

Mr. Carr testified that after his father saw Staggs running away from his house, he and his sisters went to Staggs's ex-mother-in-law's and ex-father-in-law's house, where Staggs denied stealing his handgun. When Mr. and Mrs. Carr tried to talk to Staggs about the missing gun at Imogene Staggs's house, Staggs exited the home through his bedroom window, and when they followed him into a field, Staggs denied having the gun. At the time of this denial, Staggs was carrying a red bag on his wrist, which he refused to open, and Staggs "took off running" when Mrs. Carr got close to him. Mr. Carr then chased Staggs through the field on a four-wheeler until Staggs ducked under a barbed wire fence and disappeared. A few minutes later, Mr. and Mrs. Carr found Staggs lying on the ground attempting to hide. When Mr. Carr again demanded his gun, Staggs denied having it. Mrs. Carr stated that she encountered Staggs one more time as Staggs tried to get into a truck that had stopped in the road. He ran from her and vanished in Hunter's Cove. The Carrs did not see Staggs again until he was arrested by Detective Phillips.

After this incident, Mr. and Mrs. Carr stated that they were unable to locate the .38 Smith and Wesson handgun. Mr. Carr said that the closest gun he could find to the one that was stolen was a gun worth over seven hundred dollars. Both Mr. and Mrs. Carr testified that Staggs did not have permission to be in their home and did not have permission to exercise control over any of their property, including the .38 Smith and Wesson handgun. The DVD of the video footage from the surveillance camera, which was played for the jury, showed Staggs entering the home and walking past the camera with something very small in his hand. It then showed Carl Carr entering the house before hurriedly exiting the home a moment later. Viewed in the light most favorable to the State, we conclude that a jury could have found beyond a reasonable doubt that Staggs committed the offenses of aggravated burglary and theft of property valued at more than $500 but less than $1000.

The proof at trial also established that Staggs fled from Detective Phillips, who was in uniform, when he knew that Detective Phillips was going to arrest him. After running from Carl Carr and then Mr. and Mrs. Carr several times, Staggs ran from Detective Phillips. Detective Phillips testified that after following fresh footsteps and losing the trail at one

-13-

point, he finally located Staggs approximately three-fourths of a mile down the road. Detective Phillips jumped out of his patrol car, in uniform, and ordered Staggs to stop two times before Staggs fled. He chased Staggs through a barbed wire fence and commanded him to stop several more times before finally apprehending him. Viewed in the light most favorable to the State, we conclude that a jury could have found beyond a reasonable doubt that Staggs committed the offense of evading arrest.

**II. Denial of Motion to Sever.** Staggs argues that the trial court erred in denying his motion to sever the evading arrest charge from the aggravated burglary and theft charges. Specifically, he contends that the three offenses do not arise from the same criminal episode because the evidence regarding the evading arrest offense was not "inextricably connected" to the aggravated burglary and theft offenses, because the evidence of the evading arrest offense did not form "a substantial portion of the proof" regarding the other two offenses, and because there was "a break in the action" for more than an hour between the aggravated burglary and theft offenses and the evading arrest offense. See State v. Johnson, 342 S.W.3d 468, 475 (Tenn. 2011).

The State responds that because all three of the charged offenses occurred during the same criminal episode, they were subject to the mandatory joinder rule. Alternatively, the State argues that even if the mandatory joinder rule did not apply, Staggs has failed to establish that he was entitled to a severance of the evading arrest offense under the permissive joinder rule. Upon review, we conclude that the offenses were subject to mandatory joinder because they arose out of the same criminal episode.

Here, the State initially joined the aggravated burglary, theft, and evading arrest offenses by charging them in the same indictment. Before trial, Staggs filed a Motion for Severance pursuant to Tennessee Rule of Criminal Procedure 14 to sever the evading arrest charges from the other charges. In this motion, he argued that the evading arrest charge was not part of a common scheme or plan and that the evidence admissible at trial for the other charges was inadmissible in the trial for the evading arrest charge. The State did not file a written response to this motion.

At the motion hearing just before trial, no proof was offered by the parties and only arguments by counsel were presented. Defense counsel argued that the evading arrest count should be severed from the indictment because it was not part of a common scheme or plan. She asserted that although the victims told Staggs to stop, they were not law enforcement officers and that it was approximately two hours later when the officers located Staggs. The State argued that the three charges were part of "one criminal episode because after Staggs committed the aggravated burglary and theft offenses, he was confronted by Carl Carr and then chased by Mr. and Mrs. Carr before Detective Phillips commanded him to stop and he

fled." Without determining whether the offenses were subject to the mandatory or permissive joinder rule, the court held that "under the circumstances . . . this is proper to be tried together, and I'd deny your motion for a severance." At the hearing on the motion for new trial, the trial court held that there was "no legal basis to sever the counts" because the evading arrest charge "flowed from the burglary" because Staggs "was . . . chased out of the house and chased in the field, and eventually [was arrested by law enforcement]." The court also found that proof of the evading arrest offense would have been admissible in the trial of the aggravated burglary and theft offenses.

Tennessee Rule of Criminal Procedure 8 provides for both mandatory and permissive joinder of offenses. Two or more offenses shall be mandatorily joined in the same indictment if the offenses are: "(A) based on the same conduct or arise from the same criminal episode; (B) within the jurisdiction of a single court; and (C) known to the appropriate prosecuting official at the time of the return of the indictment(s) . . . ." Tenn. R. Crim. P. 8(a)(1). The State's failure to mandatorily join offenses will bar it from later prosecuting the uncharged offenses, unless the offenses are severed pursuant to Tennessee Rule of Criminal Procedure 14. Tenn. R. Crim. P. 8(a)(2); Tenn. R. Crim. P. 8, Advisory Comm'n Comment; Johnson, 342 S.W.3d at 473. On the other hand, two or more offenses may be permissively joined in the same indictment or consolidated pursuant to Tennessee Rule of Criminal Procedure 13 if "(1) the offenses constitute parts of a common scheme or plan; or (2) they are of the same or similar character." Tenn. R. Crim. P. 8(b).

If two or more offenses are joined in the same indictment or are consolidated pursuant to Rule 13, a defendant may contest the joinder by filing a motion to sever offenses. A trial court's decision "to consolidate or sever offenses pursuant to Rules 8(b) and 14(b)(1) [is] to be reviewed for an abuse of discretion." State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999). In the event that the offenses were permissively joined, "the defendant has the right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible in the trial of the others." Tenn. R. Crim. P. 14(b)(1). In the event that the offenses were mandatorily joined, the State or the defendant may file a motion for severance before trial, and the court must grant this request if "the court finds a severance appropriate to promote a fair determination of the defendant's guilt or innocence of each offense." Tenn. R. Crim. P. 14(b)(2)(A). Therefore, a trial court must determine whether joinder was mandatory or permissive before deciding whether to grant or deny a motion to sever.

Here, although the trial court denied the motion to sever, it did not specify whether the joinder was mandatory or permissive, and it did not identify the analysis it conducted in order to make this determination. See State v. Michael Montell Williams, No. E2010-02402-CCA-R3-CD, 2011 WL 5137179, at *16 (Tenn. Crim. App. Oct. 28, 2011), perm. app.

denied (Tenn. March 6, 2012). Where "the trial court erred in its failure to utilize the proper procedure and analysis[,]" this court "must conduct the analysis that the trial court failed to conduct." State v. Garrett, 331 S.W.3d 392, 404 (Tenn. 2011).

Pursuant to Rule 8(a)(1)(A), two or more offenses shall be mandatorily joined in the same indictment if the offenses are "based on the same conduct or arise from the same criminal episode[.]" Tenn. R. Crim. P. 8(a)(1)(A). Offenses based on the same conduct involve "a single act that results in a number of interrelated offenses." Johnson, 342 S.W.3d at 473. On the other hand, offenses that arise from the same criminal episode "normally are generated by separate physical actions." Id. at 474 (quoting 2 ABA Standards for Criminal Justice § 13-1.2 cmt., at 13.10). These separate physical actions "must occur simultaneously or in close sequence and must occur in the same place or in closely situated places." Id. at 475. A gap in time between these actions "may be sufficient to interrupt the temporal proximity required for a single criminal episode to exist." Id. (citing 9 Tennessee Criminal Practice and Procedure § 17:17, at 601).

Moreover, "in order for a single criminal episode to exist, the 'proof of one offense necessarily involves proof of the others.'" Id. (quoting 2 ABA Standards for Criminal Justice § 13-1.3 cmt., at 13.10). In other words, "the proof of one offense must be inextricably connected with the proof of the other . . . or . . . the proof of one offense forms a substantial portion of the proof of the other offense." Id. (internal quotation marks and citations omitted). For instance, if a second offense is committed "during an investigation" of the first offense, then the evidence pertaining to the second offense "would necessarily require proof pertaining to" the first offense. State v. Shepherd, 902 S.W.2d 895, 903 (Tenn. 1995) (the defendant assaulted two police officers who were trying to question him about his initial offense).

In this case, because the charges against Staggs arose from different acts, the offenses must be part of the "same criminal episode" in order for the offenses to be mandatorily joined. The evading arrest occurred as a separate physical action from the aggravated burglary and theft offenses. Although the evading arrest offense did not occur simultaneously with the aggravated burglary and theft offenses, all three offenses occurred in close sequence and in closely situated places, i.e., at the victim's home and near the victim's home. Moreover, although some time elapsed between commission of the aggravated burglary the theft offenses and the evading arrest offense, such time was insufficient "to interrupt the temporal proximity required for a single criminal episode to exist." Johnson, 342 S.W.3d at 475 (citing Tennessee Criminal Practice and Procedure § 17:17, at 601). Finally, because the evading arrest offense was committed during the investigation of the aggravated burglary and theft offenses, the evidence pertaining to the evading arrest "would necessarily require proof pertaining to" the other two offenses.

-16-

Shepherd, 902 S.W.2d at 903. We, therefore, conclude that joinder of these three offenses was mandatory.

Pursuant to Rule 14(b)(2)(A), mandatorily joined offenses may be severed if "if is deemed appropriate to promote a fair determination of the defendant's guilt or innocence for each offense." A trial court's denial of a motion to sever pursuant to Rule 14(b)(2)(A) "will not be reversed unless the [defendant] was prejudiced by the decision to try the charges together." State v. Thompson, 88 S.W.3d 611, 614 (Tenn. Crim. App. 2000) (citing State v. Wiseman, 643 S.W.2d 354, 362 (Tenn. Crim. App. 1982)). Because Staggs presented no proof that he was prejudiced by the mandatory joinder of the evading arrest charge with the other offenses, Rule 14(b)(2)(A) did not require severance of these offenses. Accordingly, we conclude that the trial court properly denied the motion to sever.

**III. Admission of Surveillance Videotape.** Staggs argues that the trial court erred in admitting the Carrs' "homemade" surveillance videotape into evidence. First, he argues that the videotape was not properly authenticated because no one testified that it was a "true and accurate depiction of the events it recorded." Second, he contends that the trial court erred in admitting the videotape because it contained evidence of another crime, wrong, or act, namely his theft of medication from the victims' home, that was inadmissible because it was used by the State to show Staggs's "character trait of being in the victims' home without their consent." He asserts that the trial court erred in failing to conduct a Rule 404(b) hearing regarding this prior bad act and that even if the court had conducted a Rule 404(b) hearing, it would have been impossible for it to determine that Staggs committed the prior bad act by clear and convincing evidence because the State entered a nolle prosequi on the theft count related to the medication prior to trial. See State v. Holman, 611 S.W.2d 411, 413 (Tenn. 1981) (concluding that "evidence that the defendant committed an alleged crime other than that for which he is on trial should not be admitted when he has been acquitted of such alleged other crime"). Moreover, he asserts that the prior bad act evidence does not meet the conditions making it admissible as contextual background evidence. See State v. Goodwin, 143 S.W.3d 771, 780-81 (Tenn. 2004) (holding that the State may offer evidence of prior crimes, wrongs or acts in order to provide a contextual background for a case where the State establishes and the trial court finds that "(1) the absence of the evidence would create a chronological or conceptual void in the state's presentation of its case; (2) the void created by the absence of the evidence would likely result in significant jury confusion as to the material issues or evidence in the case; and (3) the probative value of the evidence is not outweighed by the danger of unfair prejudice"). He claims that the portion of the videotape showing him taking the medication should have been redacted before it was shown to the jury.

In response, the State argues that Staggs cannot show that the videotape was not properly authenticated because Mr. and Mrs. Carr testified about the surveillance camera, explained their knowledge about the surveillance videotape that was entered into evidence, and were subject to cross-examination by the defense. The State also argues that even if the videotape should not have been admitted, the error was harmless because the evidence of Staggs's guilt was overwhelming. We conclude that the surveillance videotape was properly authenticated.

At the pretrial hearing on Staggs's motion for suppression of the surveillance videotape, defense counsel argued that the videotape was not properly authenticated because there was not a person operating the camera to authenticate that the videotape depicted what happened at the victim's home on April 10, 2010. The State countered that the victims would properly authenticate the surveillance videotape pursuant to Tennessee Rule of Evidence 901 at trial. Ultimately, the trial court denied the motion on the basis that there was no requirement that someone testify that they were operating the camera in order for the videotape to be properly authenticated. At the motion for new trial hearing, the trial court held that the videotape "was authenticated by the . . . homeowners [who set up] the surveillance." It found that the homeowners provided "sufficient authentication" and that the defense had the opportunity to cross-examine the homeowners.

The Tennessee Supreme Court has generally held that "questions concerning the admissibility of evidence rest within the sound discretion of the trial court, and this Court will not interfere in the absence of abuse appearing on the face of the record." State v. Pylant, 263 S.W.3d 854, 870 (Tenn. 2008) (citing State v. Dotson, 254 S.W.3d 378, 392 (Tenn. 2008); State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997); State v. Van Tran, 864 S.W.2d 465, 477 (Tenn. 1993); State v. Harris, 839 S.W.2d 54, 73 (Tenn. 1992)). A trial court is found to have abused its discretion when it applies "an incorrect legal standard or [reaches] a decision which is illogical or unreasonable and causes an injustice to the party complaining." State v. Ruiz, 204 S.W.3d 772, 778 (Tenn. 2006) (citing Howell v. State, 185 S.W.3d 319, 337 (Tenn. 2006)).

"The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Tenn. R. Evid. 901(a). For tangible evidence, "a witness must be able to identify the evidence or establish an unbroken chain of custody." State v. Kilpatrick, 52 S.W.3d 81, 87 (Tenn. Crim. App. 2000) (citing State v. Goodman, 643 S.W.2d 375, 381 (Tenn. Crim. App.1982)). The purpose of this requirement is to "demonstrate that there has been no tampering, loss, substitution, or mistake with respect to the evidence." State v. Braden, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993) (citing Orr v. State, 472 N.E.2d 627, 630 (Ind. App. 1984)). Absolute certainty of

identification is not required, however.  See Kilpatrick, 52 S.W.3d at 87 (citing Ritter v. State, 462 S.W.2d 247, 250 (Tenn. Crim. App. 1970).  "Reasonable assurance, rather than absolute assurance, is the prerequisite for admission."  Id.  "If the proffered evidence is unique, readily identifiable, and relatively resistant to change, the foundation need only consist of testimony confirming its relevance."  State v. Cannon, 254 S.W.3d 287, 309 (Tenn. 2008).

Here, Mr. and Mrs. Carr provided evidence authenticating the surveillance videotape. Mr. Carr testified that he and his wife had a surveillance camera in their home, which was located on top of their microwave and aimed at their front door.  Mrs. Carr testified that she and her husband purchased the surveillance camera at "the Spy Store in Cookeville."  She stated that she reviewed the videotape after the burglary and took it to Michael's Video in Cookville to have the footage transferred from videotape to a DVD for presentation at trial. She said that the DVD that was ultimately played to the jury accurately captured the events that occurred on her home on April 10, 2010.  The trial transcript shows that defense counsel cross-examined Mrs. Carr about her authentication of the surveillance videotape.  Because Mr. and Mrs. Carr sufficiently authenticated the surveillance video, Staggs is not entitled to relief on this issue.

Staggs also argues that the trial court abused its discretion in admitting the surveillance videotape because it contained evidence of him taking medication from the victims' home.  Rule 404(b) states:

**(b) Other Crimes, Wrongs, or Acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait.  It may, however, be admissible for other purposes.  The conditions which must be satisfied before allowing such evidence are:

(1)  The court upon request must hold a hearing outside the jury's presence;
(2)  The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
(3)  The court must find proof of the other crime, wrong, or act to be clear and convincing; and
(4)  The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b).

"Rule 404 was patterned in great measure on State v. Parton, 694 S.W.2d 299 (Tenn. 1985), wherein our supreme court ruled that evidence of other crimes is generally inadmissible." State v. McCary, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003). Rule 404 "establish[es] that character evidence cannot be used to prove that a person has a propensity to commit a crime." Id. (citing Tenn. R. Evid. 404(b); State v. Adkisson, 899 S.W.2d 626, 645 (Tenn. Crim. App. 1994)). Trial courts should take a "restrictive approach [to] 404(b) . . . because 'other act' evidence carries a significant potential for unfairly influencing a jury." Neil P. Cohen et al., Tennessee Law of Evidence § 4.04[8][e] (4th ed. 2000). The more similar the conduct or act to the crime for which the defendant is on trial, the greater the potential for a prejudicial result. McCary, 119 S.W.3d at 243 (citing State v. Bordis, 905 S.W.2d 214, 232 (Tenn. Crim. App. 1995)). Other crimes, wrongs or acts are admissible under Rule 404(b) when relevant to an issue other than the defendant's character, such as intent, motive, identity, common scheme or plan, or absence of mistake. Id.

Here, although the defense filed a motion in limine requesting that the State and the victim be precluded from mentioning the theft of the medication and requesting that the theft of the medication be redacted from the videotape, it failed to object to the admission of this evidence pursuant to Rule 404(b) either before or at trial. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). It also failed to request a jury-out hearing pursuant to Rule 404(b). See Tenn. R. Evid. 404(b)(1). Consequently, Staggs has waived this issue. Waiver notwithstanding, we conclude that Staggs was not prejudiced by the admission of the videotape because none of the State's witnesses mentioned the fact that Staggs had stolen the medication and because the surveillance videotape did not clearly depict the medication packet in Staggs's hand. Accordingly, Staggs is not entitled to relief on his Rule 404(b) issue.

**IV. Instruction on Flight.** Staggs argues that the trial court erred in instructing the jury on flight because he was charged with evading arrest. He contends that the instruction on flight allowed the jury to infer guilt and lessened the State's burden of proof regarding the evading arrest charge, thereby violating his due process rights. He also argues that this error, which resulted in the lowering of the State's burden of proof, cannot be said to be "harmless beyond a reasonable doubt" because the instruction likely influenced the jury's verdict. Finally, he argues that the record does not show that he left the scene of the difficulty and subsequently hid out, evaded, or concealed himself in the community.

In response, the State argues that the trial court correctly instructed the jury on flight, that there was sufficient evidence to support the instruction, and that instructional errors do not rise to the level of a deprivation of due process. The State also argues that even if the

trial court erred in giving the instruction on flight, the error was harmless. See State v. Smith, 893 S.W.2d 908, 918 (Tenn. 1994) (concluding that the flight instruction, which stated that "whether the Defendant fled was a question solely for their decision, that they need not infer flight, and that flight alone was insufficient to prove guilt," when combined with the overwhelming proof of the defendant's guilt, rendered any error regarding the instruction harmless). We agree with the State that the trial court's instruction regarding flight was proper.

"It is well-settled in Tennessee that a defendant has a right to a correct and complete charge of the law so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." State v. Farner, 66 S.W.3d 188, 204 (Tenn. 2001) (citing State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000); State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990)). Accordingly, trial courts have a duty "to give a complete charge of the law applicable to the facts of a case." State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986) (citing Thompson, 519 S.W.2d at 792). At the conclusion of the evidence, the trial court gave the following instruction regarding flight to the jury over Staggs's objection:

> The flight of a person accused of a crime is a circumstance which, when considered with all the facts in the case, may justify an inference of guilt. Flight is the voluntary withdrawal of oneself for the purpose of evading arrest or prosecution for the crime charged. Whether the evidence presented proves beyond a reasonable doubt that the defendant fled is a question for your determination. The law makes no precise distinction as to the manner or method of flight. It may be open, or it may be hurried or a concealed departure; or it may be a concealment within the jurisdiction. However, it takes both the leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown, to constitute flight.

> If flight is proved, the fact of flight alone does not allow you to find that the defendant is guilty of the crime charged. However, such flight by a defendant may be caused by a conscience of guilt, and you may consider the fact of flight, if flight is so proven, together with all the other evidence when you decide the guilt or innocence of the defendant.

> On the other hand, an entirely innocent person may take flight, and such flight may be explained by proof offered or by facts and circumstances in the case. Whether there was flight by the defendant, the reasons for it, and the weight to be given to it, are questions for you to determine.

See T.P.I.–Crim. 42.18 (15th ed. 2011). We note that the aforementioned instruction has been cited with approval by this court. See State v. Kendricks, 947 S.W.2d 875, 885-86 (Tenn. Crim. App. 1996) (citing State v. Payton, 782 S.W.2d 490, 497-98 (Tenn. Crim. App. 1989); State v. Whittenmeir, 725 S.W.2d 686, 688 (Tenn. Crim. App. 1986)).

"In order for a trial court to charge the jury on flight as an inference of guilt, there must be sufficient evidence to support such instruction." State v. Berry, 141 S.W.3d 549, 588 (Tenn. 2004). Sufficient evidence exists supporting a jury instruction on flight where there is evidence of "both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown." State v. Burns, 979 S.W.2d 276, 289-90 (Tenn. 1998) (internal quotation marks, emphasis, and citation omitted). The State may satisfy the subsequent hiding out, evasion, or concealment requirement by presenting proof from which a jury might infer that the defendant committed such acts. State v. Terrance Wilks, No. W1999-00279-CCA-R3-CD, 1999 WL 1097832, at *4 (Tenn. Crim. App., at Jackson, Nov. 22, 1999) (citing Payton, 782 S.W.2d at 498; Rogers v. State, 455 S.W.2d 182, 186-87 (Tenn. Crim. App. 1970)).

At the hearing on the motion for new trial, the trial court held that the flight instruction was proper because Staggs "fled the scene and was chased through the field and [was] found on the road somewhere[.]" The court found it was "reasonable to conclude that [Staggs] was fleeing the scene to avoid prosecution, an arrest."

Upon review, we conclude that there was sufficient evidence presented at trial to support the jury instruction on flight. The proof at trial established that Staggs committed the aggravated burglary and theft offenses before fleeing the victim's home, running and hiding from the victims, and fleeing from a uniformed law enforcement officer after he had twice been told to stop by the officer. These facts clearly support an inference that the Staggs fled the crime scene to avoid prosecution. Although the flight instruction should have been confined to the aggravated burglary and theft charges, we conclude that no reversible error resulted. See State v. Christopher Lamont Kelso, No. E2000-01602-CCA-R3-CD, 2001 WL 681313, at *4-5 (Tenn. Crim. App. June 18, 2001). Moreover, the record shows that the flight instruction was not given contemporaneously with the evading arrest instruction and was instead given with a group of instructions far removed from the instructions regarding the elements of the charged offenses. Upon review, we fail to see how the flight instruction negatively affected Staggs's defense. Accordingly, we conclude that the trial court did not err in instructing the jury on flight and that the specific instruction given in this case was proper.

**V. Prosecutorial Misconduct.** Staggs argues that the assistant district attorney committed prosecutorial misconduct by creating an impermissible presumption of guilt when

he made the following comments during the opening statement: "[T]here's one thing I want you to ask yourself. Why would he run? You don't run if you're innocent[.]" Staggs argues that the prosecutor's comments "lowered the State's burden of proof, commented on the defendant's right to remain silent, shifted the burden of proof from the State to the defendant, and used evidence of one crime (evading arrest) to create a presumption of guilt of a second crime (aggravated burglary and theft)." Staggs asserts that the prosecutor's improper comments, when combined with the other errors in the record, could have negatively affected the verdict.

Initially, the State responds that Staggs has waived this issue by failing to make a contemporaneous objection. The State contends that the prosecutor's comments were not improper, that they did not constitute prosecutorial misconduct, and that the trial court properly instructed the jury about statements by counsel prior to the jury's deliberation. Finally, the State argues that even if the court abused its discretion regarding the prosecutor's comments, Staggs is not entitled to relief because the evidence of his guilt was overwhelming, thereby rendering any error harmless. We agree with the State that Staggs is not entitled to relief on this issue.

Here, at the end of his opening statement, the prosecutor summarized the contents of the surveillance videotape. The prosecutor stated that the videotape showed Staggs "nonchalantly" walking into the house before walking to the back bedroom where the .38 Smith and Wesson handgun was kept. He said the videotape then showed Carl Carr, Darroll Carr's eight-nine-year-old father, hesitantly walking into the house and heading to the bedroom before hurriedly retracing his steps and exiting the home. The prosecutor asserted that Carl Carr would testify that as soon as he walked out of the victim's house, he saw Staggs "running around the corner" of his son's home. Then the prosecutor said, "But there's one thing I want you to ask yourself. Why would he run? You don't run if you're innocent." At that point, the trial court interjected, "That may be beyond opening statement there, with argument. That will come later." Following the court's admonition, the prosecutor thanked the jury. At no point did the defense make an objection to the prosecutor's comments.

At the hearing on the motion for new trial, the trial court held that it addressed the prosecutor's comments during opening statement at the time they were made and that its instructions to the jury were sufficient to inform the jury they were not to consider the State's comment during the opening statement as proof. Although the court acknowledged that it did not tell the jury to disregard the State's comment at the time it was made, it held that it did not believe that the prosecutor's comment was sufficient to entitle Staggs to a new trial.

Prosecutorial misconduct does not constitute reversible error absent a showing that

it has affected the outcome of the trial to the prejudice of the defendant. State v. Bane, 57 S.W.3d 411, 425 (Tenn. 2001) (citing Terry v. State, 46 S.W.3d 147, 156 (Tenn. 2001)). In order to be entitled to relief on appeal, the defendant must "show that the argument of the prosecutor was so inflammatory or the conduct so improper that it affected the verdict to his detriment." State v. Farmer, 927 S.W.2d 582, 591 (Tenn. Crim. App. 1996) (citing Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965)).

Pursuant to Tennessee Code Annotated section 20-9-301, the parties in a jury trial have the right to make an opening statement to the court and jury "setting forth their respective contentions, views of the facts and theories of the lawsuit." The courts of this state have traditionally given counsel wide latitude in presenting their position, and a trial court's action in controlling the argument of counsel will not be reversed unless the court abused its discretion. State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978) (citing Smith v. State, 527 S.W.2d 737 (Tenn. 1975)). This court must consider the following factors when determining whether the argument of the prosecutor was so inflammatory or improper to negatively affect the verdict:

> (1) the conduct complained of viewed in the light of the facts and circumstances of the case; (2) the curative measures undertaken by the court and the prosecution; (3) the intent of the prosecutor in making the improper arguments; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength and weakness of the case.

State v. Chalmers, 28 S.W.3d 913, 917 (Tenn. 2000) (citations omitted).

We agree with the State that Staggs risked waiving review of this issue by failing to make a contemporaneous objection to the prosecutor's remark during his opening statement. See Tenn. R. App. P. 36(a); State v. Robinson, 146 S.W.3d 469, 518-19 (Tenn. 2004). However, we may review the record in this case for plain error.

In order for this court to find plain error,

> "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting Adkisson, 899 S.W.2d at 641-42). "It is the accused's burden to persuade an appellate court that the trial court committed plain

error." State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007) (citing U.S. v. Olano, 507 U.S. 725, 734 (1993)). "[T]he presence of all five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." Smith, 24 S.W.3d at 283.

Upon review of the record, we conclude that the prosecutor's comment during opening statement did not rise to the level of "plain error." See Tenn. R. App. P. 36(b) ("When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal."); Tenn. R. Evid. 103(d) ("Nothing in this rule precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the court."). Here, the State summarized the evidence it was going to present, including the fact that Staggs fled from the Carrs and law enforcement, and presented its theory that Staggs fled because he had committed the aggravated burglary and theft offenses. Aside from the trial court's curative instruction at the time of the prosecutor's comments, the court gave the jury the following instruction at the close of all proof: "Statements, arguments, and remarks of counsel are intended to help you in understanding the evidence and applying the law, but they're not evidence. If any statements were made that you believe are not supported by the evidence, you should disregard them." Given the overwhelming evidence of his guilt, Staggs has failed to establish that he was prejudiced by the prosecutor's comment during opening statement. See Bane, 57 S.W.3d at 425. Accordingly, Staggs is not entitled to relief on this issue.

**VI. Sentencing.** Finally, Staggs argues that his sentence is excessive. Specifically, he contends that the trial court erred in determining that he was a persistent offender. In addition, he claims the trial court erred by failing to apply the sentencing considerations in Tennessee Code Annotated sections 40-35-102, -103, and -210. Moreover, he argues that the trial court erred by applying the enhancement factor regarding his history of criminal convictions and behavior to determine his status as a persistent offender and to increase the length of his sentence within the applicable range. He argues that in light of this error, his sentences should be reduced to the minimum sentences in the range for his Class C felony and his Class E felony convictions. Finally, Staggs argues that the trial court's application of enhancement factors, other than the factor regarding his history of criminal convictions, to increase his sentence above the presumptive minimal sentence violated Blakely v. Washington, 542 U.S. 296 (2004). The State responds that the record fully supports Staggs's sentence and that Staggs is mistaken in his assertion that the trial court was prohibited from sentencing him to a sentence higher than the ten-year minimum sentence for a persistent offender.

Pursuant to the 2005 amendments to the sentencing act, a trial court must consider the following when determining a defendant's specific sentence and the appropriate combination of sentencing alternatives:

(1) The evidence, if any, received at the trial and the sentencing hearing;
(2) The presentence report;
(3) The principles of sentencing and arguments as to sentencing alternatives;
(4) The nature and characteristics of the criminal conduct involved;
(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and
(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

T.C.A. § 40-35-210(b) (2006). The trial court must also consider the defendant's potential for rehabilitation or treatment. Id. §§ 40-35-102, -103 (2006). The defendant has the burden of showing the impropriety of the sentence on appeal. Id. § 40-35-401(d) (2006), Sentencing Comm'n Comments.

Because of the broad discretion given to trial courts by the 2005 amendments to the sentencing act, "sentences should be upheld so long as the statutory purposes and principles, along with any applicable enhancement and mitigating factors, have been properly addressed." State v. Bise, 380 S.W.3d 682, 706 (Tenn. 2012). This court reviews a trial court's sentencing determinations under "an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707. Because the record shows that the trial court carefully considered the evidence, the enhancement and mitigating factors, and the purposes and principles of sentencing prior to imposing a within-range sentence of confinement, we uphold Staggs's sentence.

At the sentencing hearing, the trial court determined that although six certified copies of felony convictions had been introduced, ranging from a C to an E felony, it determined that Staggs was a Class III, persistent offender with a release eligibility of forty-five percent because "there was no proof that [the aggravated burglary conviction and one of the burglary convictions] did not occur within a 24-hour period." See T.C.A. § 40-35-107(b)(4). As relevant here, a defendant qualifies as a persistent offender if he or she has received "[a]ny combination of five (5) or more prior felony convictions within the conviction class or higher or within the next two (2) lower felony classes, where applicable[.]" Id. § 40-35-107(a)(1). In this case, Staggs was convicted of aggravated burglary, a Class C felony, and theft of

property valued at more than $500 but less than $1000, a Class E felony. The court received certified copies of judgments for the following felony convictions:

| Date of Offense | Conviction Offense | Felony Class |
| --- | --- | --- |
| 6/05/2003 | burglary | Class D |
| 6/10/2003 | theft of property valued at more than $500 but less than $1000 | Class E |
| 6/23/2003 | theft of property valued at $1000 or more but less than $10,000 | Class D |
| 6/29/2003 | aggravated burglary | Class C |
| 6/30/2003 | burglary | Class D |
| 7/11/2003 | evading arrest | Class E |

Because five of the certified copies of convictions were within the conviction class or higher or within the next two (2) lower felony classes for each of the conviction offenses in this case, the trial court properly sentenced Staggs as a Range III, persistent offender for his convictions for aggravated burglary and theft.

The presentence investigation report showed that in addition to the certified copies of convictions, Staggs had also received one conviction for theft of property valued at more than $1000 but less than $10,000, one conviction for theft of services valued more than $500 but less than $1000, six convictions for theft of property valued at $500 or less, one conviction for evading arrest, two convictions for disclosure of trade secrets, eight convictions for writing a check for insufficient funds, and thirteen convictions for passing worthless checks.

The court noted that Staggs had a lengthy history of criminal convictions and drug abuse, that he showed no remorse for his actions, and that he had violated his probation eight times. It determined that Staggs was not a good candidate for rehabilitation because of his lengthy history of criminal convictions and criminal behavior. It applied the enhancement factors that Staggs had "a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range" and had "before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community[.]" Id. § 40-35-114(1), (8). Although the court applied the mitigating factor that

-27-

Staggs "neither caused nor threatened serious bodily injury[,]" it did not give it "a whole lot of weight." At the end of the hearing, the trial court sentenced Staggs to the maximum sentence in his range of fifteen years for the aggravated burglary conviction, six years for theft conviction, and eleven months and twenty-nine days for the misdemeanor evading arrest conviction. See id. §§ 40-35-112(c)(3), (5), -111(e)(1) (2006). The court imposed concurrent sentencing, for an effective sentence of fifteen years in confinement. See id. § 40-35-115 (2006).

At the hearing on the motion for new trial, the trial court stated that it did not use the same convictions to enhance his sentences within the range as it did to determine that Staggs was a Range III, persistent offender because there were "other crimes sufficient to justify the Court giving him the maximum [sentence] of 15 [years]." The record shows that the trial court carefully considered the evidence, the enhancement and mitigating factors, and the purposes and principles of sentencing prior to imposing a within-range sentence of confinement in this case. Accordingly, we conclude that the trial court did not abuse its discretion in imposing an effective sentence of fifteen years in confinement.

Staggs also argues that the trial court's application of enhancement factors, other than the factor regarding his history of criminal convictions, to increase his sentence above the presumptive minimal sentence violated Blakely v. Washington, 542 U.S. 296 (2004). On June 24, 2004, the United States Supreme Court held in Blakely that "'[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.'" Blakely, 542 U.S. at 301 (quoting Apprendi v. New Jersey, 530 U.S. 466, 490 (2000)). On June 7, 2005, following Blakely, the Tennessee legislature passed a new sentencing law eradicating presumptive sentences and establishing advisory sentencing guidelines. Under the new sentencing law, "the trial court 'shall consider, but is not bound by' an 'advisory sentencing guideline' that suggests an adjustment to the defendant's sentence upon the presence or absence of mitigating and enhancement factors." State v. Carter, 254 S.W.3d 335, 344 (Tenn. 2008) (quoting T.C.A. § 40-35-210(c) (2006)).

Staggs committed the offenses in this case on April 10, 2010. The Compiler's Notes to the amended Tennessee Code Annotated section 40-35-210 state that the amended sentencing act "shall apply to sentencing for criminal offenses committed on or after June 7, 2005." Because Staggs committed his offenses after the June 7, 2005 deadline, he was sentenced under the 2005 amendments to the sentencing act, thereby making Blakely inapplicable.

**CONCLUSION**

Upon review, we conclude that the evidence is sufficient to sustain the convictions for aggravated burglary, theft of property valued at more than $500 but less than $1000, and evading arrest. We further conclude that the trial court did not err in denying the motion to sever the evading arrest charge from the other charges, that the trial court did not abuse its discretion in admitting the surveillance videotape, that jury instruction on flight was proper, that the prosecutor's comments during opening statement did not prejudice Staggs, and that the sentence in this case was not excessive.

_____
CAMILLE R. McMULLEN, JUDGE